**ABKCO MUSIC, INC. and ABKCO Music and Records, Inc., Plaintiffs–Appellees,**

v.

**STELLAR RECORDS, INC., Defendant,**

and

**Performance Tracks, Inc., Defendant–Appellant.**

No. 1137, Docket 95–7887.

United States Court of Appeals, Second Circuit.

Argued March 20, 1996.

Decided Sept. 19, 1996.

---

Andrew H. Bart, Pryor, Cashman, Sherman & Flynn, New York City, for plaintiffs–appellees.

Daniel Gunning, Encino, CA, for defendant–appellant.

Before LUMBARD and MAHONEY, Circuit Judges, and OWEN, District Judge.[1]

OWEN, District Judge:

This is an appeal from an order of the District Court for the Southern District of New York (Batts, J.), entered on August 10, 1995, preliminarily enjoining defendant-appellant Performance Tracks, Inc. ("Tracks")[2] from publishing without authority the lyrics to copyrighted songs owned by plaintiffs–appellees ABKCO Music Inc. and ABKCO Music and Records Inc. ("ABKCO"), thus prohibiting Tracks from distributing its compact discs containing the copyrighted songs. We affirm.

Although this presents a case of first impression in terms of the technology at issue, the applicable legal principles are well-settled. ABKCO owns the copyrights to seven musical compositions by Mick Jagger and Keith Richards of the Rolling Stones, including the rock-and-roll classics "Satisfaction (I Can't Get No)," "Jumping Jack Flash," and "Brown Sugar." Despite many requests, ABKCO has never licensed these famous songs for use in the "karaoke" or "sing-along" industry.

Tracks, a newcomer in the music field, is in the sing-along industry. It uses a new technology to encode on a compact disc ("CD") not only the audio rendition of a song, but also the contemporaneous video display of a song's lyrics. Thus, for a user who has a CD player with a video output, the lyrics of the songs can be displayed on a video screen in "real time" as the songs are playing so that the viewer can sing the lyrics along with the recorded artist. No other image or information appears, and the user cannot print the lyrics from the screen or control the speed of the music or lyrics. The Tracks discs, called "Compact Discs + Graphics" ("CD + G's"), will provide audio playback alone when played on standard CD players. These CD + G's are similar in purpose to the more familiar karaoke laser discs, which are quite popular in this country and abroad for entertainment at parties and nightclubs.[3] Like the CD + G's, karaoke discs display song lyrics against video images, enabling people to sing in time to the music. The primary difference between traditional karaoke discs and CD + G's is that CD + G's display only the lyrics, whereas karaoke discs display some video image, such as a sun-drenched beach, behind the song lyrics. Under the Copyright Act of 1976, 17 U.S.C. § 101 et seq., the producers and distributors of karaoke versions of songs must acquire synchronization or "synch" licenses[4] from the

---

1. Honorable Richard Owen, of the United States District Court for the Southern District of New York, sitting by designation.

2. Defendant Stellar Records, Inc. has consented to the entry of a preliminary injunction.

3. Karaoke, which means "empty orchestra," is enormously popular in Japan. "About 280,000 ... bars and other night spots now offer karaoke. Another 140,000 or so karaoke 'boxes' or small rooms, can be rented by the hour. The boxes have extended karaoke's popularity to women and young people who do not frequent bars." Andrew Pollack, *Fleeting Fame Sells in Asia For a Lot More Than a Song*, N.Y. Times, March 11, 1996, at D1, D5.

4. A synchronization license is required if a copyrighted musical composition is to be used in "timed-relation" or synchronization with an audiovisual work. 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 24.02[f] (1995) (hereinafter "Nimmer"). Most commonly, synch licenses are necessary when copyrighted music is included in movies and commercials. *See* 4 Nimmer § 24.04[C][1]. The "synch" right is a right exclusively enjoyed by the copyright owner. *Buffalo Broadcasting Co., Inc. v. ASCAP*, 744 F.2d 917, 920 (2d Cir.1984), *cert. denied*, 469 U.S. 1211, 105 S.Ct. 1181, 84 L.Ed.2d 329

copyright owners of the songs to legally manufacture karaoke discs; a copyright owner may negotiate, if so disposed, the karaoke use of a song and the terms of the authorizing synch license with a karaoke maker.

Tracks did not secure synchronization licenses from ABKCO, but instead, viewing its products as "phonorecords," obtained "compulsory licenses" for the compositions, pursuant to the Copyright Act, 17 U.S.C. § 115, which permits the manufacture and distribution of new "cover" versions of copyrighted musical works as long as the licensee follows the statutory notice requirements and pays the proper royalty fees. Section 115 of the Copyright Act provides in part:

> *Compulsory license for making and distributing phonorecords*
>
> In the case of nondramatic musical works, the exclusive rights ... to make and to distribute *phonorecords* of such works, are subject to compulsory licensing under the conditions specified by this section.
>
> (a) Availability and Scope of Compulsory License.—
>
> (1) When *phonorecords* of a nondramatic musical work have been distributed to the public in the United States under the authority of the copyright owner, any other person ... may, by complying with the provisions of this section, obtain a compulsory license to make and distribute *phonorecords* of the work. A person may obtain a compulsory license only if his or her primary purpose in making *phonorecords* is to distribute them to the public for private use....
>
> (2) A compulsory license includes the privilege of making a musical arrangement of the work to the extent necessary to conform it to the style or manner of interpretation of the performance involved, but the arrangement shall not change the basic melody or fundamental character of the work, and shall not be subject to protection as a derivative work under this title, ex-

cept with the express consent of the copyright owner.

17 U.S.C. § 115 (emphasis added).

Under the Copyright Act, "phonorecords" are defined as

> material objects in which *sounds, other than those accompanying a motion picture or other audiovisual work,* are fixed by any method now known or later developed, and from which the sounds can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. The term "phonorecords" includes the material object in which the sounds are first fixed.

17 U.S.C. § 101 (emphasis added). "Audiovisual works" are defined as

> works that consist of *a series of related images* which are intrinsically *intended to be shown by the use of machines* or devices such as projectors, viewers, or electronic equipment, *together with accompanying sounds,* if any, regardless of the nature of the material objects, such as films or tapes, in which the works are embodied.

17 U.S.C. § 101 (emphasis added).

Tracks sent ABKCO a CD+G entitled "Songs of the Rolling Stones" containing the compositions, as well as notices of its intention to obtain compulsory licenses for the compositions. ABKCO thereupon informed Tracks that the Rolling Stones CD+G infringed on its copyrights of the compositions, and shortly thereafter initiated this action.

On July 5, 1995, ABKCO obtained a temporary restraining order. Thereafter, on August 10, 1995, Judge Deborah A. Batts, ruling from the bench, granted a preliminary injunction enjoining Tracks from "further publishing the lyrics of plaintiff's copyrighted Rolling Stones songs without authorization to do so," concluding that the visual depiction of the lyrics constituted an unauthorized publication of the lyrics, infringing ABKCO's copyrights. Tracks appeals pursuant to 28 U.S.C. § 1292(a)(1).

---

(1985). The Copyright Act does not explicitly confer synchronization rights, but courts have held that the synch right is derived from the exclusive right of a copyright owner, under 17 U.S.C. § 106(1), to reproduce his work. *Agee v.*

*Paramount Communications, Inc.,* 853 F.Supp. 778, 786 (S.D.N.Y.1994), *aff'd in part, rev'd in part,* 59 F.3d 317 (2d Cir.1995); *Angel Music, Inc. v. ABC Sports, Inc.,* 631 F.Supp. 429, 433 n. 4 (S.D.N.Y.1986).

■ It is well-settled in this circuit that a preliminary injunction requires a showing of (1) irreparable harm and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions about the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting relief. *See, e.g., Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 33 (2d Cir.1995). To demonstrate likelihood of success, AB-KCO must establish *prima facie* a copyright infringement by showing that it owns valid copyrights and that Tracks has engaged in unauthorized copying. *See, e.g., Hasbro Bradley, Inc. v. Sparkle Toys, Inc.,* 780 F.2d 189, 192 (2d Cir.1985); 3 Nimmer § 13.01. As to irreparable harm, generally when a copyright plaintiff makes out a *prima facie* showing of infringement, irreparable harm may be presumed. *Hasbro Bradley,* 780 F.2d at 192; *see also Wainwright Securities Inc. v. Wall Street Transcript Corp.,* 558 F.2d 91, 94 (2d Cir.1977), *cert. denied,* 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978); *American Metropolitan Enterprises of New York, Inc. v. Warner Bros. Records, Inc.,* 389 F.2d 903, 905 (2d Cir.1968).

■ Our review of an order granting or denying a preliminary injunction is generally limited to whether there has been an abuse of discretion, *see, e.g., Shapiro v. Cadman Towers, Inc.,* 51 F.3d 328, 332 (2d Cir.1995), which usually involves either the application of an incorrect legal standard or reliance on clearly erroneous findings of fact. *Id.*

Tracks asserts as error, first, the district court's conclusion that the CD + G's visual display of song lyrics constitutes an unauthorized reproduction in violation of 17 U.S.C. § 106[5] because the visual feature of the CD + G's is not within the ambit of the compulsory license provisions of 17 U.S.C. § 115, and second, the court's holding that the irreparable harm requirement had been satisfied.

■ In granting the preliminary injunction, the court below properly found that Tracks' compulsory licenses do not give it the right to publish the compositions' lyrics on a screen. Song lyrics enjoy independent copyright protection as "literary works," 1 Nimmer § 2.05[B], and the right to print a song's lyrics is exclusively that of the copyright holder under 17 U.S.C. § 106(1). Thus, while a compulsory license permits the recording of a "cover" version of a song, it does not permit the inclusion of a copy of the lyrics. That requires the separate permission of the copyright holder.

The court below correctly viewed *Bourne Co. v. Walt Disney Co.,* No. 91 Civ. 0344, 1992 WL 204343 (S.D.N.Y. Aug. 7, 1992), as supporting its conclusion. Disney had obtained from plaintiff publisher's predecessor-in-interest a license to use the song "Little Wooden Head" from the film Pinocchio in synchronization with any Disney motion picture. The court in *Bourne* enjoined Disney, however, from using the song in a "sing-along" format on videocassettes in which the lyrics appeared at the bottom of the screen and a printed copy of the lyrics accompanied the video. The district court held in *Bourne* that the "right to print the lyrics ... is qualitatively different from the right to synchronize that song with a visual image":

> [E]ven if ... Disney had acquired the right to use the Pinocchio songs on videocassettes, that would not give it the right to print the lyrics of those songs, a right which appears to rest exclusively with [the plaintiff publisher].

*Id.* at *4–5. As in *Bourne,* the district court here properly concluded that a compulsory phonorecord license does not give Tracks the right to publish the lyrics on a screen.

A time-honored method of facilitating singing along with music has been to furnish the singer with a printed copy of the lyrics. Copyright holders have always enjoyed exclusive rights over such copies. While projecting lyrics on a screen and producing printed copies of the lyrics, of course, have their differences, there is no reason to treat them differently for purposes of the Copyright Act.

**5.** 17 U.S.C. § 106 states that "[s]ubject to sections 107 through 120, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following: (1) to reproduce the copyrighted work in copies or phonorecords...."

■ While we hardly need go further to affirm, we deal briefly with Tracks' contention that the court below, applying *Bourne*, was in error because its CD + G's are "phonorecords," not copies,[6] within the meaning of the Copyright Act, and therefore its compulsory licenses include the right to its limited video display. While the court below did not reach this contention, we do so hereafter and conclude that it is both factually and legally flawed.

■ Tracks' contention that CD + G's are "phonorecords" and thus the video aspect is within the grant of its compulsory licenses can be disposed of quickly. The plain language of the Copyright Act refutes Tracks' view. Phonorecords are defined as objects on which "sounds" are fixed; CD + G's, however, are objects on which sounds *and* visual representations of *song lyrics* are fixed. Moreover, the term phonorecord expressly excludes "audiovisual works," yet CD + G's constitute "audiovisual works," since they "consist of a series of related images"—the lyrics—"together with accompanying sounds"—the music. 17 U.S.C. § 101.

Tracks does not claim that the actual definition of "phonorecord" in Section 101 includes the visual capabilities of its CD + G's, but rather contends that the Copyright Act has not kept pace with new technology, and that Congress, in view of its definition of "digital music recording" in the Audio Home Recording Act of 1992, 17 U.S.C. § 1001 et seq. ("AHRA"),[7] would include Tracks' entire CD + G capability within the definition of "phonorecords" if it were to redefine "phono-

record" today. It would, however, seem to be a sufficient answer to Tracks' contention to observe that Tracks' product is *not* within the statutory definition of "phonorecord," and what Congress may or may not do in the future to redefine the term is not for us to speculate.

We further note that the AHRA itself undercuts Tracks' contention as to Congressional leaning. Tracks relies upon the AHRA definition of "digital music recording,"[8] as well as the definition of "audiogram" in the legislative history, although the latter term, which appeared in an earlier version of the legislation, does not appear in the AHRA as enacted. *See* S.Rep. No. 294, 102d Cong., 2d Sess. 1 (1992) (hereinafter "Senate Report").[9] Tracks, arguing from the Senate Report, notes that an "audiogram" is "intended to include such items as the textual and graphic materials commonly embodied on (or inserted inside) album covers, CD boxes and audio cassette packages, such as title and artist information, biographies and still photos of the performers, *and lyrics* of the musical works." S.Rep. No. 294 at 46 (emphasis added). It is this, Tracks ultimately contends, that evidences that if Congress were to revisit the definition of "phonorecord" in the Copyright Act, it would amend the term to include visual depictions of song lyrics, thereby authorizing Tracks to produce its CD + G's under the single umbrella of a compulsory license.

Not only have we earlier observed that Tracks' interpretation of the relationship between audiograms and phonorecords contra-

---

**6.** Copies are defined as "material objects, *other than phonorecords*, in which a work is fixed by any method now known or later developed. . . ." 17 U.S.C. § 101 (emphasis added).

**7.** The AHRA was enacted to address the problem of private copying of music using new digital recording devices. Primarily, the AHRA limits the ability of individuals to make digital copies of audio recordings, and provides for royalty payments to copyright holders. H.R.Rep. No. 873, 102d Cong., 2d Sess., pt. 1, at 8–26 (1992), *reprinted in* 1992 U.S.C.C.A.N. 3578, 3579–3596.

**8.** "A 'digital musical recording' is a material object— (i) in which are fixed, in a digital recording format, only sounds, and material, statements, or instructions incidental to those

fixed sounds, if any, and (ii) from which the sounds and material can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 1001(5)(A).

**9.** In the Senate Report, an "audiogram" is "a material object (i) in which are fixed, by any method now known or later developed, only sounds (and not, for example, a motion picture or other audiovisual work even though it may be accompanied by sounds), and material, statements or instructions incidental to those fixed sounds, if any, and (ii) from which the sounds and material can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." S.Rep. No. 294 at 2.

dicts the plain language of the Copyright Act, but also the AHRA has specifically used the term "digital musical recording" instead of "phonorecords" to "avoid[ ] any impact on other unamended provisions of the current Copyright Act, such as section 115, which grants a compulsory license. . . ." H.R.Rep. No. 873 at 17, 1992 U.S.C.C.A.N. at 3587. Moreover, the Senate Report states that "[t]he use of the new term 'audiogram' in chapter 10 is *not* intended to diminish, *enlarge*, or otherwise affect the scope of the term 'phonorecord' as it is used in . . . title 17." S.Rep. No. 294 at 53 (emphasis added). Tracks' argument founders on this.

Although the court below did not directly address Tracks' contention dealt with above, its observations implicitly—and correctly—rejected Tracks' interpretation of the AHRA:

> It seems to me that Congress at the time it passed the Audio Home Recording Act . . . was aware of the provision of the Copyright Act and the definitions of the Copyright Act, and that if Congress had intended to amend the Copyright Act, or had it intended that its 1992 Audio Home Recording Act was to have some impact on the Copyright Act, I'm sure that Congress would have said so. . . .

J.A. at A211.

 Lastly, Tracks contends that the injunction issued by the court below was erroneously granted without an adequate demonstration of irreparable harm. Tracks asserts "[i]t is a dramatic leap in logic to argue that the addition of the lyrics to an indisputably permissible activity [rerecording a copyrighted composition pursuant to the compulsory license provisions of 17 U.S.C. § 115] somehow instantly creates irreparable harm to the copyright holders." We disagree. It is precisely this addition of the lyrics to be projected on the screen that renders the CD + G's potentially lucrative for Tracks, and at the same time, if not enjoined, would leave ABKCO with a difficult reconstruction of damages should that issue arise at a later time, and would put ABKCO at the risk of disadvantageous exploitation of its artists in ways it would not have authorized. In any event, in a copyright infringement case, once a *prima facie* case of infringement

has been demonstrated, irreparable harm is normally presumed, and substantial deference is given to a district court finding of irreparable harm. *LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 79 (2d Cir.1985). Thus, the court below, having a sound legal and factual basis for its assessment of a likelihood of success of on the merits, was justified in relying on the presumption of irreparable harm.

## CONCLUSION

For the foregoing reasons, the order of the district court granting the preliminary injunction is affirmed.