364 F.3d 471
 NXIVM CORPORATION and First Principles, Inc., Plaintiffs-Appellants,
v.
THE ROSS INSTITUTE, Rick Ross also known as Ricky Ross, John Hochman, and Stephanie Franco, Defendants-Appellees,
Paul Martin and Wellspring Retreat, Inc., Consolidated-Defendants-Appellees.
 No. 03-7952.
 United States Court of Appeals, Second Circuit.
 Argued November 19, 2003.
 Decided April 20, 2004.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Arlen L. Olsen, Schmeiser, Olsen & Watts, LLP, Latham, N.Y. (Kevin A. Luibrand, Tobin and Dempf, LLP, Albany, NY, on the brief), for Plaintiffs-Appellants.
 Thomas F. Gleason, Gleason, Dunn, Walsh & O'Shea, Albany, NY (Douglas M. Brooks, Martland and Brooks LLP, Saugus, MA, on the brief), for Defendants-Appellees The Ross Institute, Rick Ross also known as" Ricky Ross," and John Hochman, and for Consolidated-Defendants-Appellees Paul Martin, and Wellspring Retreat, Inc.
 Harold Kofman and Anthony J. Sylvester, Riker, Danzig, Scherer, Hyland & Perretti LLP, Morristown, NJ (Hinman, Howard & Kattell LLP, Binghamton, NY, on the brief), for Defendant-Appellee Stephanie Franco.
 Before: WALKER, Chief Judge, JACOBS and STRAUB, Circuit Judges.
 Judge JACOBS concurs in the majority opinion and in a separate concurring opinion.
 JOHN M. WALKER, JR., Chief Judge.
 
 
 1
 This case presents us with an opportunity to examine the import of the Supreme Court's holding in Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985), that "`the propriety of the defendant's conduct'" is relevant to the "`character'" of the use under the first factor of the statutory fair use test for copyright infringement. Id. at 562, 105 S.Ct. 2218 (quoting 3 M. Nimmer, Copyright § 13.05[A], at 13-72 (1984)); see 17 U.S.C. § 107 (enumerating the fair use factors). Because a full balancing of the statutory fair use factors of § 107, including an evaluation of the propriety of defendants' conduct, favors the relevant defendants-appellees in this case, we affirm.
 
 
 2
 Plaintiffs-appellants NXIVM and First Principles, Inc. (collectively, "NXIVM"), producers of business training seminars, appeal from the decision of the United States District Court for the Northern District of New York (Thomas J. McAvoy, District Judge), denying a preliminary injunction against various defendants-appellees who were alleged to have infringed NXIVM's copyrighted course materials by posting part of them on the internet. Although we find that the district court erred in its application of the first statutory fair use factor, we ultimately agree that NXIVM cannot show a likelihood of success on the merits. Accordingly, we affirm. See Adirondack Transit Lines, Inc. v. United Trans. Union, Local 1582, 305 F.3d 82, 88 (2d Cir.2002) ("[W]e are entitled to affirm... on any ground for which there is support in the record, even if not adopted" by the district court); see also AmBase Corp. v. City Investing Co. Liquidating Trust, 326 F.3d 63, 72 (2d Cir.2003)(same); Wright v. Giuliani, 230 F.3d 543, 547 (2d Cir.2000).
 
 I. BACKGROUND
 
 3
 NXIVM provides a course manual for the paid subscribers to its exclusive and expensive seminar training program known as "Executive Success." The 265-page manual contains a copyright notice on virtually every page and all seminar participants sign non-disclosure agreements, purporting to bar them from releasing the manuscript or proprietary techniques learned in the seminars to others. It is unpublished in the sense that it is not available to the general public. NXIVM claims to have developed a proprietary "technology" called "Rational Inquiry," TM a methodology to improve communication and decision-making.
 
 
 4
 Defendant Rick Ross runs nonprofit websites, www.rickross.com and www.cultnews.com, in connection with his work as a for-profit "cult de-programmer." The websites provide information to the public about controversial groups, about which complaints of mind control have been lodged. Ross allegedly learned of NXIVM's activities in the course of his de-programming services, obtaining the manuscript indirectly from defendant Stephanie Franco, a one-time NXIVM participant.
 
 
 5
 Two reports authored separately by defendants John Hochman and Paul Martin, self-styled experts on groups such as NXIVM, were commissioned by Ross; they analyze and critique the materials from the manual. The reports quote sections of the manual in support of their analyses and criticisms and were ultimately made available to the public through Ross's websites. One of the reports plainly acknowledges that NXIVM has "intellectual property rights" in its materials and that NXIVM makes an effort to keep its manual "confidential." This report seems to appreciate that its access to the copyrighted materials was unauthorized, although this is likely a disputed issue of fact.
 
 
 6
 NXIVM sued Ross and various co-defendants for copyright infringement under 17 U.S.C. §§ 106 & 106A, trademark disparagement under the Lanham Act, 15 U.S.C. § 1125(a), and interference with contractual relations under state law (because the materials were allegedly procured through defendant Franco's purported violation of her non-disclosure agreement). Principally on the basis of the copyright infringement claim, NXIVM moved for a preliminary injunction to require that defendants remove the copyrighted information from Ross's websites.
 
 
 7
 The district court denied the preliminary injunction, finding no likelihood of NXIVM's success on the merits because defendants' fair use defense was likely to succeed. See Random House, Inc. v. Rosetta Books LLC, 283 F.3d 490, 491 (2d Cir.2002) (per curiam). However, the district court preliminarily enjoined Stephanie Franco from any further release of NXIVM's materials. NXIVM appealed.
 
 II. DISCUSSION
 A. Legal Standards
 
 8
 We review the denial of a preliminary injunction for an abuse of discretion. See Zervos v. Verizon New York, Inc., 252 F.3d 163, 171 (2d Cir.2001). But we may affirm on any ground supported by the record. AmBase Corp., 326 F.3d at 72. A party seeking a preliminary injunction in this circuit must show: (1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor. ABKCO Music, Inc. v. Stellar Records, Inc., 96 F.3d 60, 64 (2d Cir.1996). In a copyright case, the irreparable harm requirement can be met by proof of a likelihood of success on the merits. Id.
 
 
 9
 To demonstrate a likelihood of success on the merits of its copyright claim, NXIVM must establish that it owns a valid copyright and that defendants have engaged in unauthorized copying. See id. Defendants can defeat this prima facie showing of infringement, however, by demonstrating that their copying is protected by the fair use doctrine. See Tufenkian Import/ Export Ventures, Inc. v. Einstein Moomjy, Inc., 338 F.3d 127, 131 (2d Cir.2003); Infinity Broad. Corp. v. Kirkwood, 150 F.3d 104, 107 (2d Cir.1998). The factors relevant to determining whether fair use applies to a particular case are set forth in 17 U.S.C. § 107, which provides:
 
 
 10
 Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work ... for purposes such as criticism, comment, news reporting, teaching ..., scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include —
 
 
 11
 (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
 
 
 12
 (2) the nature of the copyrighted work;
 
 
 13
 (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
 
 
 14
 (4) the effect of the use upon the potential market for or value of the copyrighted work.
 
 
 15
 The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.
 
 
 16
 Although defendants bear the burden of proving that their use was fair, see Infinity, 150 F.3d at 107, they need not establish that each of the factors set forth in § 107 weighs in their favor. Wright v. Warner Books, Inc., 953 F.2d 731, 740 (2d Cir.1991). Instead, all factors must be explored and the results weighed together in light of the purposes of copyright and the fair use defense. See Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 578, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994).
 
 B. Defendants' Fair Use Defense
 
 17
 At the core of this appeal is the proper weighing, in a copyright infringement suit, of the first of the four statutory fair use factors after Harper & Row, 471 U.S. at 539, 105 S.Ct. 2218. We must decide whether the district court should have more fully and explicitly considered, in its analysis of the first factor, that defendants must have known (or at least very likely knew) that the unpublished manuscript from which quotations were taken and which was disseminated on the internet was acquired in an unauthorized fashion. We conclude that the district court did not fully analyze the impact of defendants' alleged misappropriation of the NXIVM manual in assessing fair use. Accordingly, we cannot adopt the district court's fair use analysis in whole. However, following our own review of the relevant factors, including the subfactor that the district court failed to address fully and explicitly within the first factor, we conclude that the doctrine of fair use still defeats any likelihood of plaintiffs' success on the merits. Accordingly, we affirm the denial of the preliminary injunction.
 
 
 18
 We turn to the four-factor test for fair use.
 
 1. The "purpose and character" inquiry
 
 19
 The court's function, in inquiring into "the purpose and character of the use," 17 U.S.C. § 107(1), is:
 
 
 20
 to see, in Justice Story's words, whether the new work merely `supersede[s] the objects' of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message..., in other words, whether and to what extent the new work is `transformative.' ... [T]he goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works. Such [transformative] works thus lie at the heart of the fair use doctrine's guarantee of breathing space ...
 
 
 21
 Campbell, 510 U.S. at 579, 114 S.Ct. 1164 (citations omitted)(alterations in original). We agree with the district court that the websites' use of quotations from the manual to support their critical analyses of the seminars is transformative. As we held in Wright,"there is a strong presumption that factor one favors the defendant if the allegedly infringing work fits the description of uses described in § 107." Wright, 953 F.2d at 736. Where the defendants' use is for the purposes of "criticism, comment ... scholarship, or research," 17 U.S.C. § 107, factor one will normally tilt in the defendants' favor.
 
 
 22
 This presumption, moreover, is not necessarily rebutted by a concurrent commercial purpose on a defendant's part, here the fact that Ross and Martin also run for-profit businesses in connection with their criticisms. The Supreme Court in Campbell rejected the notion that the commercial nature of the use could by itself be a dispositive consideration. The Campbell opinion observes that "nearly all of the illustrative uses listed in the preamble paragraph of § 107, including news reporting, comment, criticism, teaching, scholarship, and research ... `are generally conducted for profit,'" Campbell, 510 U.S. at 584, 114 S.Ct. 1164 (quoting Harper & Row, 471 U.S. at 592, 105 S.Ct. 2218)(Brennan, J., dissenting), and that Congress "could not have intended" a rule that commercial uses are presumptively unfair. Id. The commercial objective of the secondary work is only a subfactor within the first factor. "[T]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." Id. at 579, 114 S.Ct. 1164. Finding the work substantially transformative, the district court properly discounted the secondary commercial nature of the use.
 
 
 23
 What the district court did not fully and explicitly consider, and what NXIVM correctly urges that it should have considered, is "the propriety of [a] defendant's conduct," as directed by Harper & Row, 471 U.S. at 562-63, 105 S.Ct. 2218 (citations omitted). Our circuit has recognized that this is an integral part of the analysis under the first factor. Wright, 953 F.2d at 737; see also Los Angeles News Serv. v. KCAL-TV Channel 9, 108 F.3d 1119, 1122 (9th Cir.1997) (finding analysis of the defendant's conduct to be relevant "at least to the extent that [the defendant] may knowingly have exploited a purloined work for free that could have been obtained for a fee"). While some have commented that this inquiry is counter-indicated by the policy interests supporting copyright and fair use protections, see, e.g., Pierre N. Leval, Toward a Fair Use Standard, 103 Harv. L.Rev. 1105, 1126-28 (1990) (arguing against considering the defendants' good or bad faith), Harper & Row directs courts to consider a defendant's bad faith in applying the first statutory factor.
 
 
 24
 Thus, to the extent that Ross, Martin, or Hochman knew that his access to the manuscript was unauthorized or was derived from a violation of law or breach of duty, this consideration weighs in favor of plaintiffs. Moreover, it has been considered relevant within this subfactor that a defendant could have acquired the copyrighted manuscript legitimately; in this case, the relevant defendants could have paid the requisite fee to enroll in NXIVM's seminars.[1] See generally William F. Patry, The Fair Use Privilege in Copyright Law 109, 130-32 (2d ed.1995). The district court should have more fully and explicitly considered defendants' bad faith within its analysis of the first factor and did not. For the purposes of our analysis here, we assume defendants' bad faith and weigh this subfactor in favor of plaintiffs.
 
 
 25
 But just how much weight within the first factor should a court place on this subfactor of bad faith? Some courts have found Harper & Row to stand for the broad proposition that "[t]o invoke the fair use exception, an individual must possess an authorized copy of a literary work." Atari Games Corp. v. Nintendo of Am. Inc., 975 F.2d 832, 843 (Fed.Cir.1992). Since we assume defendants' copy of the NXIVM manuscript was unauthorized, the rule enunciated in Atari would foreclose the fair use defense altogether based upon defendants' bad faith.
 
 
 26
 However, we read Harper & Row's holding more narrowly than the broad proposition suggested by Atari. In Harper & Row, the defendants knowingly acquired a "purloined manuscript" for the very purpose of preempting the plaintiff's first publication rights, rights already sold by the copyright owner, for which the defendants had an opportunity to bid. The Court wrote that the defendants' "use had not merely the incidental effect but the intended purpose of supplanting the copyright holder's commercially valuable right of first publication." 471 U.S. at 562, 105 S.Ct. 2218. Ultimately, the Court rejected the fair use defense in Harper & Row, not just because of the defendants' bad faith, but also because the defendants had failed to make any substantial transformative use of the copyrighted work. Id. at 543, 105 S.Ct. 2218. Here, while NXIVM urges that its first publication rights were similarly "scoop[ed]," id. at 542, 556, 562, 105 S.Ct. 2218, defendants' use in this case was quite plainly critical and transformative. See also Chicago Bd. of Educ. v. Substance, Inc., 354 F.3d 624, 628 (7th Cir.2003) (distinguishing Harper & Row on the basis that Harper & Row did not involve criticism of the copyrighted work).
 
 
 27
 Because the Harper & Row Court did not end its analysis of the fair use defense after considering and ascertaining the defendants' bad faith there, we believe that the bad faith of a defendant is not dispositive of a fair use defense. Instead, we agree with the court in Religious Tech. Ctr. v. Netcom On-Line Communication Servs., Inc., 923 F.Supp. 1231, 1244 n. 14 (N.D.Cal.1995), that "[n]othing in Harper & Row indicates that [the defendants'] bad faith [is] itself conclusive of the fair use question, or even of the first factor." Moreover, "[a]fter Campbell, it is clear that a finding of bad faith, or a finding on any one of the four factors, cannot be considered dispositive." Id.; see also Campbell, 510 U.S. at 578, 114 S.Ct. 1164 (emphasizing that no single fair use factor is dispositive and warning against the application of "bright-line rules" in fair use analysis); 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.05[A][1][d] (2003)(noting that "knowing use of a purloined manuscript militates against a fair use defense," but not suggesting that bad faith is an absolute bar to fair use).[2]
 
 
 28
 Thus, while the subfactor pertaining to defendants' good or bad faith must be weighed, and while it was error for the district court not to have fully and explicitly considered it, we find that even if the bad faith subfactor weighs in plaintiffs' favor, the first factor still favors defendants in light of the transformative nature of the secondary use as criticism. If no statutory factor can be dispositive after Campbell, neither can a single subfactor be, a fortiori. 2. The "nature of the copyrighted work" inquiry
 
 
 29
 The parties do not dispute that because the copyrighted work is unpublished, the district court properly found the second factor, "the nature of the copyrighted work," to favor plaintiffs. See Harper & Row, 471 U.S. at 564, 105 S.Ct. 2218 ("The fact that a work is unpublished is a critical element in its `nature,'" and "the scope of fair use is narrower with respect to unpublished works.") (citations omitted); but see 17 U.S.C. § 107 ("The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.").
 
 3. The "amount and substantiality" inquiry
 
 30
 Consideration of the third factor, "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," 17 U.S.C. § 107(3), "has both a quantitative and a qualitative component," New Era Pubs. Int'l, ApS v. Carol Publ'g Group, 904 F.2d 152, 158 (2d Cir.1990). The factor favors copyright holders where the portion used by the alleged infringer is a significant percentage of the copyrighted work, or where the portion used is "essentially the heart of" the copyrighted work, Harper & Row, 471 U.S. at 565, 105 S.Ct. 2218 (internal quotation marks omitted). Courts have also considered "whether the quantity of the material used was reasonable in relation to the purpose of the copying." Am. Geophysical Union v. Texaco Inc., 60 F.3d 913, 926 (2d Cir.1994)(internal quotation marks omitted).
 
 
 31
 The district court found that this factor was "at best, neutral," because: (1) defendants copied from only 17 pages of a manual 500 pages long; (2) the "heart" of the work for which plaintiffs were seeking protection, the actual process or idea of "Rational Inquiry," is not copyrightable expression under 17 U.S.C. § 102(b); and (3), in any event, this "heart" could not be summed up in the 17 pages that were copied. As to (3), the district court essentially found that there was no "identifiable core that could be appropriated," Maxtone-Graham v. Burtchaell, 803 F.2d 1253, 1263 (2d Cir.1986).
 
 
 32
 NXIVM takes issue with the district court's analysis. First, plaintiffs claim that the district court erred in its counting that defendants quote from 17 pages of "over 500 pages of course materials." NXIVM argues that the proper count is 25 pages out of a total of 191 pages because the court below mistakenly included in its count schedules, promotional materials, and duplicated pages, using a Bates-stamping proxy instead of investigating each page.
 
 
 33
 While plaintiffs are correct that the district court over-counted the denominator (the total number of pages), it is plain that the district court also substantially over-counted the numerator (the number of pages copied) by attributing as entire pages quotes as short as a single sentence. Taking these adjustments into account, the quantity of the copyrightable work copied does not weigh in favor of plaintiffs.
 
 
 34
 Second, plaintiffs emphasize that much of defendant Martin's article is simply quotation from plaintiffs' work. They urge us to consider the ratio of copied material included in Martin's article to original material in the article. However, we decline to do so; the statutory enumeration of the third factor plainly requires only an analysis "in relation to the copyrighted work," not the infringing work. 17 U.S.C. § 107(3).
 
 
 35
 Third, plaintiffs offer yet another argument in support of their analysis of the quantity inquiry within the third factor. They seek to narrow the denominator, the total page count of plaintiffs' work, by conceptualizing the single course manual as separate "modules," each of which they urge is a separate denominator. NXIVM claims support for this approach citing the United States Copyright Office's willingness to register copyrights to plaintiffs at the "module" level. Applying this analysis, plaintiffs allege that defendants copied some entire works. Plaintiffs analogize their theory to a defendant who copies individual articles from a magazine containing separately copyrighted articles. See Am. Geophysical Union, 60 F.3d at 925. We cannot accept this analogy.
 
 
 36
 If plaintiffs' argument were accepted by courts — and, not surprisingly, plaintiffs cite no authority to support it — the third factor could depend ultimately on a plaintiff's cleverness in obtaining copyright protection for the smallest possible unit of what would otherwise be a series of such units intended as a unitary work. The proper analogy in this case is not to separate articles in a magazine, but instead to a book by a single author containing numerous chapters, which are not separately copyrightable. See id. at 925-26 (treating individual articles in a journal as the appropriate level of copyright protection when the author of each article is different). The "modules" in this case were written by the same author and they combine to produce one unitary work.
 
 
 37
 Finally, plaintiffs argue that the district court did not engage in the required qualitative analysis at all in looking to see if defendants copied the core of plaintiffs' work. We agree that from the transcript of Judge McAvoy's decision it is unclear whether the district court performed this analysis satisfactorily; to the extent that it did not, we fill the gap here and conclude that the qualitative component of the third factor does not favor plaintiffs.
 
 
 38
 While Harper & Row found that copying only 300 words of an entire book could capture the "heart" of it, 471 U.S. at 564-65, 105 S.Ct. 2218, that case arose under distinguishable facts. In Harper & Row, the plaintiffs copyrighted an autobiography of Gerald Ford that was principally of interest for its treatment of the Watergate scandal. Thus, when the defendant magazine in that case published, with virtually no commentary, the very section of the book containing Ford's views on Watergate, the Court could easily identify it as the core of the manuscript.
 
 
 39
 Here, by contrast, there is no objective core of expression in the course materials that can be similarly identified. Even plaintiffs reveal their appreciation of this fact when they charge defendants principally with copying the heart of their "services." Such services, however, are not copyrightable expression. See 17 U.S.C. § 102(b) (withholding copyright protection from any "idea, procedure, process, system, method of operation, concept, principle, or discovery"). Moreover, by pressing their "module" argument, plaintiffs virtually concede that defendants could not have taken the core of the copyrighted work, because they do not see the manual as having a core, but rather as an assemblage of "modules."
 
 
 40
 Finally, we agree with the district court that, in order to do the research and analysis necessary to support their critical commentary, it was reasonably necessary for defendants to quote liberally from NXIVM's manual. Accordingly, we find that the third factor does not favor plaintiffs.
 
 4. The "market" inquiry
 
 41
 The fourth statutory fair use factor requires us to evaluate the economic impact of the allegedly infringing use upon the copyright owner. The focus here is on whether defendants are offering a market substitute for the original. In considering the fourth factor, our concern is not whether the secondary use suppresses or even destroys the market for the original work or its potential derivatives, but whether the secondary use usurps the market of the original work. Campbell, 510 U.S. at 593, 114 S.Ct. 1164. As we stated in Wright, the relevant market effect with which we are concerned is the market for plaintiffs'"expression," and thus it is the effect of defendants' use of that expression on plaintiffs' market that matters, not the effect of defendants' work as a whole. Wright, 953 F.2d at 739. That the fair use, being transformative, might well harm, or even destroy, the market for the original is of no concern to us so long as the harm stems from the force of the criticism offered. See Campbell, 510 U.S. at 591-92, 114 S.Ct. 1164 ("[A] lethal parody, like a scathing theater review, kills demand for the original, [but] does not produce a harm cognizable under the Copyright Act.").
 
 
 42
 This factor weighs heavily in defendants' favor. It is plain that, as a general matter, criticisms of a seminar or organization cannot substitute for the seminar or organization itself or hijack its market. To be sure, some may read defendants' materials and decide not to attend plaintiffs' seminars. Indeed, the record reflects that soon after the dissemination of defendants' material, actress Goldie Hawn cancelled a visit with NXIVM's leader, Keith Raniere. But that sort of harm, as the district court properly recognized, is not cognizable under the Copyright Act. If criticisms on defendants' websites kill the demand for plaintiffs' service, that is the price that, under the First Amendment, must be paid in the open marketplace for ideas. See, e.g., New Era, 904 F.2d at 160 (citing the "fundamentally different functions" of a critique and a copyrighted original by virtue of their "opposing viewpoints") (citing Maxtone-Graham, 803 F.2d at 1264); Campbell, 510 U.S. at 591-92, 114 S.Ct. 1164.
 
 5. Summary
 
 43
 Recognizing that "[a]ll [factors] are to be explored, and the results weighed together, in light of the purposes of copyright," Campbell, 510 U.S. at 578, 114 S.Ct. 1164, and that no one factor should dominate the analysis, the district court properly denied the preliminary injunction. We agree with the district court that defendants' writings "are undoubtedly transformative secondary uses intended as a form of criticism. All of the alleged harm arises from the biting criticism of this fair use, not from a usurpation of the market by ... defendants." Accordingly, we affirm the denial of the preliminary injunction on the copyright infringement claim because plaintiffs are not likely to succeed on the merits. Even a finding of bad faith by defendants would not automatically preclude finding that their use was fair use.
 
 C. The Trademark Disparagement Claim
 
 44
 We have carefully considered plaintiffs' arguments that they are entitled to a preliminary injunction on their trademark disparagement claim and find them to be without merit. "[T]he touchstone of whether a defendant's actions may be considered `commercial advertising or promotion' under the Lanham Act is that the contested representations are part of an organized campaign to penetrate the relevant market." Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc., 314 F.3d 48, 57 (2d Cir.2002). As we have already observed in connection with the copyright claim, defendants are not trying to get into the relevant market that is NXIVM's central business concern. Accordingly, we affirm the district court's rejection of the plaintiffs' application for a preliminary injunction on their trademark disparagement claim.
 
 III. CONCLUSION
 
 45
 For the foregoing reasons, the district court's denial of a preliminary injunction is affirmed.
 
 
 
 Notes:
 
 
 [1]
 With the district court, we decline to rule on the enforceability of the particular non-disclosure agreement NXIVM requires its participants to sign; nothing here turns upon it and the issue is not properly before us. We do note, however, that even if the non-disclosure agreement were enforceable, a violation of that agreement would be a breach of a contractual duty but would notipso facto be a copyright infringement. On the other hand, such a violation of a contractual duty, if it were found to be an enforceable duty, would be relevant in assessing the bad faith subfactor within the first factor.
 
 
 [2]
 Campbell provides further support for the proposition that while the good or bad faith of a defendant generally should be considered, it generally contributes little to fair use analysis. See Campbell, 510 U.S. at 585 n. 18, 114 S.Ct. 1164. In Campbell the Court found, in the context of a parody made by the defendants, that the defendants' request for permission to use the original copyrighted work and the plaintiffs' denial of that permission could not — as an evidentiary matter — be used to show that the defendants believed that their use was not fair. The Court wrote that "regardless of the weight one might place on the alleged infringer's state of mind," and that "[e]ven if good faith were central to fair use ... being denied permission to use a work does not weigh against a finding of fair use." 510 U.S. at 585 n. 18, 114 S.Ct. 1164 (citing Harper & Row, 471 U.S. at 562, 105 S.Ct. 2218) (citation omitted). We believe this analysis further supports our conclusion that a finding of bad faith is not to be weighed very heavily within the first fair use factor and cannot be made central to fair use analysis. The Court recognized the continuing relevance of Harper & Row, but clarified that the bad faith subfactor can be de-emphasized and will not be dispositive of the first factor or fair use. We follow Harper & Row and await from the Supreme Court a clearer renunciation than the Campbell footnote of bad faith's relevance (however attenuated) to the fair use inquiry.
 
 
 JACOBS, Circuit Judge, concurring:
 
 46
 I concur in the majority opinion and subscribe in nearly all respects to its analysis, with the following further observations.
 
 
 47
 The majority opinion assumes that Dr. Ross and his co-defendants may have acquired the NXIVM training manual in bad faith, and observes that the district court did not explore this question. Even assuming such bad faith, the majority opinion nonetheless concludes that the defendants' quotation from the NXIVM original was a fair use protected by § 107. This is because Ross used the passages from NXIVM's manuals to criticize the original, i.e., with a literary intention and effect that differed sufficiently from that of the original to be transformative. Accordingly, Dr. Ross' publication of the quoted material did not enter the marketplace as a potential substitute for NXIVM's original. In the majority's words, "[a]ll of the alleged harm arises from the biting criticism of [the defendant's] fair use, not from usurpation of the market" that properly belongs to the plaintiff. Maj. Op. at 482.
 
 
 48
 With all of this I completely agree. The fact that the defendants might have acted in bad faith in acquiring the plaintiff's material did not bar a finding of fair use. I would go somewhat further. The majority assumed, based on the Supreme Court's having said so in Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 562-63, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985), that bad faith on the part of secondary users has a proper place in the fair use analysis. The Court's observation in Harper & Row was, however, a make-weight wholly unnecessary to the outcome; rejection of the fair use defense was compelled by the essential statutory considerations: the defendant took the "heart" of the plaintiff's book (the part the public was most interested in reading), and in so doing, usurped a significant part of its market.
 
 
 49
 The Supreme Court's most recent consideration of fair use in Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 585 n. 18, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994), treats as an open question whether the secondary user's good or bad faith is pertinent to the fair use inquiry (contrary to its observation in Harper & Row). The present case affords an occasion to assess whether bad faith on the part of a secondary user plays a productive role in the fair use inquiry. For the reasons that follow, I think that the secondary user's good or bad faith in gaining access to the original copyrighted material ought to have no bearing on the availability of a fair use defense. Fair use defines the outer boundary of copyright protection, and that perimeter should be drawn by reference to the central objectives of copyright. Copyright itself would be distorted if its contours were made to depend on the morality and good behavior of secondary users.
 
 
 50
 * Twenty years ago in Harper & Row, the Supreme Court held that THE NATION'S scoop of a TIME magazine article previewing the memoirs of President Ford was an infringement. Harper & Row, 471 U.S. at 569, 105 S.Ct. 2218. Although THE NATION contended that the newsworthiness of its piece compelled a finding of fair use, the article failed every prong of the fair use statute, 17 U.S.C. § 107: its conceded purpose was to scoop the authorized publication by TIME magazine and thus "supplant[ ] the copyright holder's commercially valuable right of first publication," id. at 562, 105 S.Ct. 2218; it appropriated the "heart" of the memoir, id. at 564-66, 105 S.Ct. 2218; and it "directly competed for a share of the market for prepublication excerpts," id. at 568, 105 S.Ct. 2218. In short, Harper & Row was not a close case. Nevertheless, in its review of the "purpose and character" of THE NATION'S infringement, the Court made the additional observation that "[f]air use presupposes good faith and fair dealing" and noted the district court's finding that "The Nation knowingly exploited a purloined manuscript" to get its scoop. Id. at 562-63, 105 S.Ct. 2218.
 
 
 51
 However, when the Supreme Court next considered fair use, in a challenge to 2 Live Crew's pop parody of a Roy Orbison song, the pertinence of bad faith was treated as an open question, not as a point settled by Harper & Row:
 
 
 52
 [R]egardless of the weight one might place on the alleged infringer's state of mind, compare Harper & Row, 471 U.S. at 562[ ], 105 S.Ct. 2218 (fair use presupposes good faith and fair dealing) (quotation marks omitted), with Folsom v. Marsh, 9 F.Cas. 342, 349 (No. 4,901) (C.C.D.Mass.1841) (good faith does not bar a finding of infringement); [Pierre N.] Leval, [Toward a Fair Use Standard, 103 Harv. L.Rev. at] 1126-27 (good faith irrelevant to fair use analysis), we reject [the] argument that 2 Live Crew's request for permission to use the original should be weighed against a finding of fair use. Even if good faith were central to fair use, 2 Live Crew's actions do not necessarily suggest that they believed their version was not fair use.... If the use is otherwise fair, then no permission need be sought or granted.
 
 
 53
 Campbell, 510 U.S. at 585 n. 18, 114 S.Ct. 1164 (emphasis added). In opposition to Harper & Row's assumption that "fair use presupposes good faith and fair dealing," the Campbell footnote highlighted the seemingly contrary inference of Justice Story's classic statement of the fair use principles in Folsom, as well as an often-cited study that questions whether good faith should be weighed in the balancing of "the social benefit of a transformative secondary use against injury to the incentives of authorship." Pierre N. Leval, Toward a Fair Use Standard, 103 Harv. L.Rev. 1105, 1126-27 (1990) ("Leval I"). Campbell's contrary-to-fact phrasing — "[e]ven if good faith were central to fair use" — rather suggests that it should not.
 
 
 54
 So, even if Harper & Row did state in passing that fair use presupposes good faith, Campbell reopened the question. See, e.g., Religious Tech. Ctr. v. Netcom On-Line Communication Servs., Inc., 923 F.Supp. 1231, 1244 n. 14 (N.D.Cal.1995) ("Campbell ... hardly endorses the good faith requirement."). Campbell's footnoted discussion questioning the pertinence of good faith reinforces the entire thrust of the decision, which requires that fair use be assessed primarily in light of whether the secondary work quotes the original with a transformative purpose and whether it usurps a market that properly belongs to the original author — issues as to which the defendant's good faith in accessing the plaintiff's original work does not matter.
 
 II
 
 55
 Campbell reinvigorated the doctrine, paramount since at least Justice Story's opinion in Folsom v. Marsh, 9 F.Cas. 342 (C.C.D.Mass.1841) (No. 4,901), that the fair use defense exists to encourage the creation of original works that do not "supersede the objects" — and thus the market value — of the original. 510 U.S. at 576, 114 S.Ct. 1164 (quoting Folsom, 9 F.Cas. at 348); see also Pierre N. Leval, Nimmer Lecture: Fair Use Rescued, 44 U.C.L.A. L.Rev. 1449, 1465 (1997) ("Leval II") ("[Campbell] revives the transformative-superseding dichotomy as the dominant consideration.").
 
 
 56
 Fair use is not a doctrine that exists by sufferance, or that is earned by good works and clean morals; it is a right — codified in § 107 and recognized since shortly after the Statute of Anne — that is "necessary to fulfill copyright's very purpose, `[t]o promote the Progress of science and the useful arts....'" Campbell, 510 U.S. at 575, 114 S.Ct. 1164 (quoting U.S. Const., art. I, § 8, cl. 8). The fair use doctrine "requires courts to avoid rigid application of the copyright statute" when it "would stifle the very creativity which that law was designed to foster." Id. at 577, 114 S.Ct. 1164 (emphasis added) (citation, internal quotation marks, and alteration omitted); see also, Leval II, 44 U.C.L.A. L.Rev. at 1465. The main purpose of the first-factor inquiry under § 107 is to see whether the new work merely supersedes the original or "instead ... is `transformative.'" Campbell, 510 U.S. at 578-79, 114 S.Ct. 1164 (quoting Leval I, 103 Harv. L. Rev at 1111). Two closely-related inquiries are crucial: Does the secondary work quote or copy the first with the same literary intention as the original or with a new, transformative purpose? Does the secondary work usurp some of the market for the first by serving as an alternate means of acquiring the quoted material? As Campbell pointed out, these inquiries, specified in the first and fourth listed factors of § 107, are correlated: the greater the transformative purpose of the secondary use, the less potential purchasers will see it as an alternative means of acquiring the original. See id. at 591, 114 S.Ct. 1164. Similarly, the more the secondary work quotes the original to communicate an identical message or purpose, the more likely it is that potential purchasers will see the secondary work as an alternate means of acquiring the first — in which case, the secondary work will likely usurp the original's rightful market. The bad faith of the secondary user in gaining access to the original author's material has no rational bearing on those crucial interrelated inquiries. See Leval I, 103 Harv. L.Rev. at 1126. A person who acquires the original work by crooked or unsavory means may expose himself to all sorts of civil claims and criminal charges; but the question of fair use itself should be decided on the basis of the transformative character and commercial effects of the secondary use. If the use satisfies the criteria of § 107, it is fair because it advances the utilitarian goals of copyright.
 
 
 57
 It might seem that it can never hurt to put bad faith at a disadvantage. But copyright is not about virtue; it is about the encouragement of creative output, including the output of transformative quotation. Its goals are not advanced if bad faith can defeat a fair use defense. The limited monopoly bestowed by the copyright statute "is intended to motivate the creative activity of authors and inventors, by the provision of a special reward, and to allow the public access to the products of their genius after the limited period of exclusive control has expired." Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 429, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984). Though the statute allows a copyright holder to recover damages suffered at the hands of an infringer, see, e.g., 17 U.S.C. § 504 (1996), the reward to be gained (or the loss suffered) is a "secondary consideration" in the copyright scheme; its "`primary object ... lies in the general benefits derived by the public from the labors of authors.'" See United States v. Paramount Pictures, Inc., 334 U.S. 131, 158, 68 S.Ct. 915, 92 L.Ed. 1260 (1948) (quoting Fox Film Corp. v. Doyal, 286 U.S. 123, 127, 52 S.Ct. 546, 76 L.Ed. 1010 (1932)).
 
 
 58
 In Campbell, the Court affirmed that the fair use defense exists to further these same goals; it is not, as its label may connote, a privilege conferred on the well-intentioned. Fair play is no defense to infringement, see, e.g., Folsom, 9 F.Cas. at 349 (finding infringement despite having "no doubt [] that [defendant's copying was] deemed [by him] a perfectly lawful and justifiable use of the plaintiff's work"), and bad faith should be no obstacle to fair use. Thus a hotelier who stocks each room with photocopies of a newly copyrighted translation of the Bible is not saved from infringement by his piety; similarly, a movie reviewer who critiques — and reveals — a surprise ending is not deprived of the fair use defense by his malice or spite. Nor should a book critic be denied the fair use protection because she gained access to a prepublication manuscript by deceit. Fair use is not a permitted infringement; it lies wholly outside the domain protected by the author's copyright.
 
 
 59
 Bad faith is a slippery concept in the copyright context. It (i) is difficult to define, (ii) may be impossible to detect, and (iii) given weight, may lead to the suppression of transformative works that are valuable to the expansion of public knowledge. In deciding whether to publish a work derived from copyrighted source material, a publisher ought to be able to make a judgment based solely on a comparison of the two works in light of market conditions, as indicated by the factors expressly set out in § 107. The goals of copyright are disserved if publishers (and editors) risk liability on the basis of the (often unknown or unsuspected) tactics and morals of authors who produce transformative works. Incremental risks drive up the cost of publication, thus the prudent publisher may elect to forgo a new work altogether if the good faith of the creator cannot be assured. And when bad faith is apparent or discovered, an otherwise transformative work will not be published at all — a result in tension (at least) with the public good that copyright exists to promote. See Sony, 464 U.S. at 429-34, 104 S.Ct. 774. "The monopoly privileges that Congress may authorize [pursuant to Article I, section 8] are neither unlimited nor primarily designed to provide a special private benefit ... [and anyone] who makes a fair use of the work is not an infringer of the copyright with respect to such use." Id. at 429, 433, 104 S.Ct. 774 (emphasis added).
 
 III
 
 60
 Not unreasonably, the majority opinion considers us bound by Harper & Row. That case undoubtedly said that "fair use presupposes good faith and fair dealing," an observation that the Supreme Court has never expressly disavowed. Nonetheless, the Campbell footnote invites and provokes discussion of the issue as an open question where it may arise.
 
 
 61
 This case illustrates why bad faith on the part of the secondary user should not be factored into the fair use analysis. Dr. Ross and his co-defendants quoted from NXIVM's manual to show that it is the pretentious nonsense of a cult. Potential purchasers of NXIVM's services will not buy the secondary work as an alternative means of acquiring the material quoted from the original; the secondary articles therefore do not usurp or supersede a market that properly belongs to NXIVM. Certainly, no critic should need an author's permission to make such criticism, regardless of how he came by the original; nor should publication be inhibited by a publisher's anxiety or uncertainty about an author's ethics if his secondary work is transformative. The majority opinion thus properly affirms the district court's finding of fair use, notwithstanding the possibility that the defendant might have obtained the plaintiff's materials by an act of deception or otherwise in bad faith.