**CORBITT MANUFACTURING COMPANY, INC.,**
Plaintiff,

v.

**GSO AMERICA, INC.; and GSO Georgia, Inc., Defendants.**

**No. CV 201–204.**

United States District Court,
S.D. Georgia,
Brunswick Division.

April 19, 2002.

---

Jenny L. Cisne, Chanley T. Howell, Foley & Lardner, Jacksonville, FL, Donna Linn Crossland, Taylor, Odachowski & Sperry, LLC, St. Simons Island, GA, W. Bruce Lewis, Gwin, Lewis & Punches, LLP, Natchez, MS, for plaintiff.

Wallace E. Harrell, Gilbert, Harrell, Gilbert, Sumerford & Martin, PC, Brunswick, GA, Robert Myron Kincaid, Jr., Baker & Hostetler, LLP, Columbus, OH, Deborah A. Wilcox, Baker & Hostetler, LLP, Cleveland, OH, for defendants.

## ORDER

BOWEN, Chief Judge.

Plaintiff Corbitt Manufacturing Company has moved for a preliminary injunction. On March 27 and 28, 2002, an evidentiary hearing was held to address Plaintiff's request. For reasons stated below, Plaintiff's motion for a preliminary injunction is **DENIED.**

### I. Introduction

Plaintiff and Defendants manufacture and market mulch. In 1990, Plaintiff registered the trademark "NO FLOAT" for its mulch. Plaintiff packages and sells its mulch under this name. According to Plaintiff, Defendants are infringing this trademark by using the words "NON–FLOATING" on their packaging. Plaintiff also brings additional federal and state law trademark claims.

Defendants produce a similar mulch. Defendants admit to using "NON–FLOATING" on their packaging, but they claim this constitutes fair use—a defense to a trademark infringement claim. Defendants contend that "NON–FLOAT-ING" is a common descriptive term for mulch. They also maintain that the description is necessary because consumers demand a mulch which resists the tendency to "float" or move due to rainfall or irrigation. In addition, Defendants deny that their packaging creates a likelihood of confusion with Plaintiff's product.

### II. Background

Plaintiff is a Florida corporation. Plaintiff claims it has sold mulch under its "NO FLOAT" mark since 1990. On October 10, 1990, Plaintiff filed an application for federal registration of its NO FLOAT mark. The United States Patent & Trademark Office approved the application on July 14, 1992.

The name NO FLOAT is not arbitrary. Plaintiff contends its mulch possesses superior qualities which distinguish it from the competition. Specifically, Plaintiff claims that its mulch lacks the propensity to float away when exposed to water. To achieve this characteristic, Plaintiff uses a patented manufacturing process.

Since 1990, Plaintiff has developed a large enterprise in manufacturing and selling mulch. Plaintiff sells its product in twenty-eight states, Guam, and Puerto Rico. NO FLOAT is sold by over 400 unaffiliated retailers, including Home Depot and Wal–Mart. Over the past five years, Plaintiff has sold over 23 million

bags of mulch, spent $300,000 to promote NO FLOAT, and generated $37 million in revenues.

Defendants GSO America, Inc. and GSO Georgia, Inc. (collectively "GSO") are Ohio corporations. GSO Georgia is authorized to do business in Georgia. GSO also manufactures and markets mulch. In 1970, it began operating in the mulch market as a broker. Over time, GSO expanded its operations.

According to GSO, it produces a "premium-grade cypress mulch" for commercial and residential landscaping. GSO claims its mulch resists decay and insect infestation. More importantly, GSO maintains that its "100% cypress mulch" does not float away.

GSO has two lines of mulch products. One line is sold under its house name and logo, GSO AMERICA. GSO AMERICA is a federally registered trademark. According to GSO, it has marketed this line since January 1, 1990. GSO's other mulch product line uses the brand name GOLDEN TROPHY. GOLDEN TROPHY is also a registered trademark and was first used in January 1991. GOLDEN TROPHY is GSO's premium brand.

In 1999, GSO altered the packaging of GOLDEN TROPHY. According to GSO, it wanted to highlight GOLDEN TROPHY's water-resistant properties. To this end, GSO placed the following quotation on the packaging: "won't wash away, blow away or float away!"

In 2000, GSO altered its packaging again. The reason for this change is disputed. In addition to stating the mulch "won't wash away, blow away or float away," the packaging reads "100% Cypress Mulch" on one line, and "NON–FLOATING" on the line below. The two lines containing "100% Cypress Mulch" and "NON–FLOATING" appear near the center of the package. This lawsuit turns on GSO's use of "NON FLOATING."

Corbitt claims "NON FLOATING" infringes and dilutes its NO FLOAT trademark. In addition, Corbitt claims Defendants' product actually floats away when exposed to water.

Otherwise, GSO's latest packaging is clear. The label and print colors are green, gold, and blue. The packaging also contains the depiction of a rain cloud. GSO asserts that these changes occurred to emphasize the water-resistant characteristics of GOLDEN TROPHY. GSO maintains that the trademarks, GSO AMERICA and GOLDEN TROPHY, clearly appear on the front and sides of this packaging. Most importantly, GSO argues that the changes do not, and were not intended to, create confusion with Plaintiff's NO FLOAT brand.

GSO contrasts its packaging with Plaintiff's NO FLOAT packages. According to GSO, NO FLOAT comes in two types of packaging. One contains black striping with gold trim, limited white wording, and a blue water design. The other package is labeled, "PURE TIDEWATER RED CYPRESS, THE LONGEST LASTING, MOST DECORATIVE." The second package also contains four panels describing the properties of the mulch. At the bottom, the NO FLOAT trademark appears. Both packages contain the word "CORBITT," Plaintiff's house mark.

In the fall of 2001, GSO entered into negotiations to purchase the Corbitt company. The negotiations failed. Shortly afterwards, GSO claims that Corbitt complained about GSO's packaging for the first time. Corbitt filed suit on November 9, 2001.

Corbitt brings an assortment of federal and state law claims. All of the federal claims fall under the Lanham Act and include trademark infringement, trademark dilution, false designation of origin, and unfair competition. With the addition

of a false advertising claim, the state-law claims mirror the federal ones. Based on these claims, Corbitt seeks a preliminary injunction.

### III. Preliminary Injunction Standard

Corbitt wishes to enjoin the use of "NON–FLOATING" on GSO's packaging. Corbitt possesses a burden of persuasion to show: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that its own injury outweighs the injury to the other party; and (4) the injunction would serve the public interest. *Tally–Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1022 (11th Cir.1989). A preliminary injunction is an extreme remedy and should be granted only when all four elements are clearly established. *Horton v. City of St. Augustine*, 272 F.3d 1318, 1326 (11th Cir. 2001).

Although the other factors will be discussed, the primary question is whether Corbitt has shown a substantial likelihood of success on the merits. Corbitt seeks a preliminary injunction based on all of its claims. Each claim will be discussed in turn.

### A. Likelihood of Success on the Merits

#### 1. Trademark Infringement

Federal law allows the owner of a federally registered trademark to sue any person for trademark infringement if the person reproduces or imitates the registered trademark without the registrant's consent. 15 U.S.C. § 1114(1). To succeed on an infringement claim, a party must show: "(1) that its mark has priority and (2) that the defendant's mark is likely to cause consumer confusion." *Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.*, 122 F.3d 1379, 1382 (11th Cir.1997). Georgia law and federal law share the same standard for trademark infringement. *See Ackerman Security v. Design Security*, 201 Ga.App. 805, 806, 412 S.E.2d 588 (1991) (using federal law to decide an infringement claim based on a state-registered trademark). There is no dispute about the priority of Corbitt's mark. The crucial questions are the following: (1) whether a likelihood of confusion exists between NO FLOAT and "NON–FLOATING"; and (2) whether GSO may be entitled to a "fair use" defense.

#### a. A Likelihood of Confusion

In the Eleventh Circuit, a multi factored analysis determines the likelihood of trademark confusion. The test is comprised of the following components: "(1) type of mark, (2) similarity of mark, (3) similarity of the products the marks represent, (4) similarity of the parties' retail outlets and customers, (5) similarity of advertising media used, (6) defendant's intent and (7) actual confusion." *Lone Star Steakhouse*, 122 F.3d at 1382. The most important factors are the type of mark and actual confusion. *Id.*

#### (1) Type of Mark

The type of mark is a measure of the trademark's strength, and it falls into one of four categories: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary. *Frehling Enter., Inc. v. Int'l Select Group, Inc.*, 192 F.3d 1330 (11th Cir.1999) "The categories are based on the relationship between the name and the service or good it describes." *Id.* A generic mark is the weakest because it refers to a general class of goods or services. *Id.* A generic term is incapable of being registered. *Id.* "Descriptive marks describe a characteristic or quality of an article or service." *Id.* A suggestive mark indicates a characteristic of the good or service and requires the consumer to make an inferential step to associate the term with the product. *Id.* Finally, an arbitrary mark holds no logical

connection to the good or service. *Id.* Arbitrary marks are the strongest. *Id.* at 1335–36.

 NO FLOAT qualifies as a strong mark. The mark was registered on July 14, 1992. Five years later, the mark became "incontestable" under the Lanham Act. 15 U.S.C. § 1065. Although the incontestable status usually gives the mark's holder certain evidentiary rights, *see* 15 U.S.C. § 1115(b), it also plays a role in the likelihood of confusion analysis. Under the "type of mark" factor, an incontestable mark is "presumed to be at least descriptive with secondary meaning." *Dieter v. B & H Indus. of Southwest Fla., Inc.,* 880 F.2d 322, 329 (11th Cir.1989). Accordingly, NO FLOAT is a "relatively strong mark." *Id.* At this stage of the case, I will afford NO FLOAT the minimum strength entitled to an incontestable mark. NO FLOAT is more descriptive of mulch than suggestive, and it certainly is not arbitrary. Accordingly, it is a descriptive mark with secondary meaning.

### (2) Similarity of Marks

This factor presents greater difficulties. Under the "similarity of the marks" prong, "the court compares the marks and considers the overall impression that the marks create, including the sound, appearance, and manner in which they are used." *Frehling Enter.,* 192 F.3d at 1337. To resolve this issue in Plaintiff's favor, the court must necessarily first find that "NON–FLOATING" constitutes a trademark. Although "NON–FLOATING" appears near the center of the packaging, it is accompanied by other prominent words and symbols. In particular, two of GSO's federally registered marks, GSO AMERICA and GOLDEN TROPHY, also appear on the bag. The parties use different colors and images for their packaging.

Deeming "NON–FLOATING" a trademark poses further difficulties because GSO argues "NON–FLOATING" was never meant to be a trademark. "NON–FLOATING" is an important description of GSO's product, and GSO wanted to highlight this characteristic. GSO's intent in prominently using the words "NON–FLOATING" bears upon whether "NON–FLOATING" is a trademark. In addition, the prominence of "NON–FLOATING" may have been motivated by the desire of GSO's managers to respond to Corbitt's communications with Home Depot. (*See infra* Part III.A.1.b (discussing the possible reasons why GSO added "NON–FLOATING" and "100% CYPRESS MULCH" to its packaging.)) Assuming "NON–FLOATING" is not a trademark, the differences in packaging create an overall impression of distinct manufacturers.

If "NON–FLOATING" is considered a trademark, however, it is similar to Corbitt's NO FLOAT mark. Although NO FLOAT is a more idiomatic description of mulch, the pronunciation of the two marks is highly similar. More importantly, the appearance of the two marks is confusing. A customer glancing at "NON–FLOATING" and NO FLOAT would probably hesitate to distinguish the two. Finally, they are both used prominently on packages of mulch.

Despite the similarities between an isolated comparison of "NON–FLOATING" and NO FLOAT, this factor does not weigh in Corbitt's favor. To find the marks similar, I would have to deem "NON–FLOATING" a trademark. This conclusion could be reached only after taking "NON–FLOATING" out of context. The overall impression created by GSO's "NON–FLOATING" bag, however, is distinct from Corbitt's NO FLOAT product. In short, the parties' packaging looks nothing alike. Accordingly, the "similarity of marks" factor poses a significant obstacle

to Corbitt's motion for a preliminary injunction.

### (3) Similarity of the product and Similarity of Retail Outlets

The next two factors are combined because they both favor a likelihood of confusion. The products are highly similar. Both claim to be 100% cypress mulch with water resistant properties. The parties also sell their products through the same retailers. Sales to Home Depot and Wal-Mart account for a substantial portion of both parties' revenues.

### (4) Similarity of Advertising Media

The evidence regarding advertising is limited. Corbitt's owner, H.C. Corbitt, testified that his company advertises on radio throughout Florida. GSO stated that it uses in-store displays to market its product. However, the parties presented little evidence regarding an overlap in their advertising.

### (5) Defendant's Intent

Corbitt provides insufficient evidence to find that GSO adopted its latest packaging with an intent to copy Corbitt. Corbitt claims GSO was attempting to "ride the wave" of Corbitt's success. However, GSO's witnesses flatly denied that Corbitt's trademark motivated the change in GSO's design. In sum, Corbitt's contentions regarding this factor are highly speculative.

### (6) Actual Confusion

 The parties vigorously dispute the evidence regarding actual confusion. For the purpose of deciding this motion, all evidence presented was admitted, including evidence of customer confusion. Corbitt introduced testimony by its employees and employees of Home Depot regarding customer confusion between NO FLOAT and GSO's "NON-FLOATING" package. (*See e.g.,* Isley Dep. at 15; Pellegrin Dep.

at 65; Seastrom Dep. at 40–45.) Corbitt also provided evidence about Home Depot's employees being confused. (*See* Pellegrin Dep. at 103; Seastrom Dep. at 12.) Finally, Corbitt kept a telephone log of customer complaints. According to Corbitt's employee, Pam Feazell, who kept the log, retailers and consumers have called to complain about confusion between the parties' products. (*See e.g.,* Pl.'s Ex. 6 at COR–00063.) With this evidence admitted, the parties dispute its value.

 GSO contends that the complaints of confusion are too isolated. "[V]ery little proof of actual confusion [is] necessary to prove the likelihood of confusion." *World Carpets, Inc. v. Dick Littrell's New World Carpets,* 438 F.2d 482, 489 (5th Cir.1971). "[I]t is not the number of people actually confused by the marks that is important but rather the type of person confused." *Frehling,* 192 F.3d at 1341. In particular, customer confusion is highly probative of actual confusion. *Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.,* 675 F.2d 1160, 1167 (11th Cir.1982). Consequently, Corbitt's evidence of customer confusion is relevant to the analysis. Corbitt submitted evidence that its employees and Home Depot employees received several consumer complaints about confusion. While the confusion of Home Depot's employees deserves less weight, it also points to actual confusion.

GSO also argues that the consumers who complained were unrepresentative of typical buyers. Citing Professor McCarthy's treatise on trademark law, GSO contends that "[c]areless, inattentive, or indifferent consumers" should not factor into the actual confusion prong. (Doc. No. 40 at 6;) 2 McCarthy, Trademarks & Unfair Competition § 23:5 (2001). However, GSO provides no evidence that the consumers in question were unsophisticated. Although the remarks of Home Depot's employees

should receive less deference, GSO has supplied sufficient evidence of customer confusion.

### (7) Totality of the Factors

Although evidence of actual confusion was introduced, Corbitt has failed to show a substantial likelihood of success in proving likelihood of confusion. The biggest obstacle to Corbitt's success is similarity of the marks. A reasonable customer would have difficulty ignoring the marked differences in the parties' packaging. The different colors and images create an overall impression of distinct manufacturers. In addition, Corbitt provides purely speculative evidence about GSO's intent. Corbitt's trademark is presumed to be a descriptive mark with secondary meaning, but it does not rise to the level of a suggestive or arbitrary mark. Corbitt also did not provide substantial evidence regarding similarity of advertising media. Finally, I note that likelihood of confusion is a question of fact for the jury. *Conagra, Inc. v. Singleton,* 743 F.2d 1508, 1514 (11th Cir. 1984). At this stage of the litigation, Corbitt has not made a sufficient showing of likelihood of confusion.

### b. Fair Use Defense

 Even if GSO's use of "NON–FLOATING" infringed upon Corbitt's NO FLOAT trademark, GSO argues the "fair use" defense immunizes it from liability. An incontestable mark, such as NO FLOAT, is subject to certain statutory defenses. The fair use defense allows a person to use a descriptive term, which is "charged to be infringement," if the term is not used as a trademark. 15 U.S.C. § 1115(b)(4). In addition, the use must be fair and in good faith. *Id.* This defense "forbids a trademark registrant [from] appropriat[ing] a descriptive term and so prevent others from accurately describing a characteristic of their goods." *Soweco,*

*Inc. v. Shell Oil Co.,* 617 F.2d 1178 (5th Cir.1980).

 Corbitt maintains that GSO uses "NON FLOATING" as a trademark. "[L]ettering, type-style, size and visual placement and prominence of the challenged words" are factors in determining whether a term is being used as a trademark. McCarthy on Trademarks and Unfair Competition § 11:46 (4th ed.2002). And as indicated by the Lanham Act, the term must describe a property or characteristic of the product. 15 U.S.C. § 1115(b)(4); *Soweco,* 617 F.2d at 1186. While "NON–FLOATING" is located at the center of GSO's packaging, other prominent terms appear on the bag. Among the other terms are "GOLDEN TROPHY" and "GSO AMERICA," GSO's federally registered trademarks. "GOLDEN TROPHY" is accompanied at the top of the bag by an image of a golden trophy. In addition, "100% CYPRESS MULCH" appears in large print directly above "NON–FLOATING." Unlike the more ornate imagery surrounding "GOLDEN TROPHY" trademark, the terms "100% CYPRESS MULCH" and "NON–FLOATING" are written in straightforward block print. Given the totality of the terms and imagery, I cannot rule out the possibility of GSO succeeding on its fair use defense.

This conclusion is reinforced by the descriptive nature of "NON–FLOATING." GSO uses the term to highlight an important characteristic of its product. Unlike "NO FLOAT," "NON FLOATING" is grammatically correct. Finally, other mulch producers also use variations of "float" in a similar manner. (Def.'s Exs. 6, 7.)

Corbitt has not undermined GSO's claim of good faith. In fact, testimony by GSO's employees indicates that GSO included the terms "NON–FLOATING" and "100% CYPRESS MULCH" after Mr. Corbitt

told Home Depot's purchasing agents that GSO's mulch lacked these properties. According to GSO, Home Depot stopped purchasing its product and caused GSO to lose substantial sums of money. As a result, GSO professionally tested the content and quality of its mulch. The test purportedly revealed that GOLDEN TROPHY mulch was completely composed of cypress and that it did not float. GSO then altered its packaging to put "NON–FLOATING" and "100% CYPRESS MULCH" in prominent positions. GSO claims it wanted to emphasize these characteristics for consumers. For purposes of this motion, GSO uses "NON–FLOATING" in good faith.

The viability of GSO's fair use defense further weakens Corbitt's chances of success on the merits. Although "NON–FLOATING" may be responsible for some customer confusion, the evidence falls short of completely invalidating the defense. The case may ultimately end in Corbitt's favor. At this point in time, however, Corbitt has failed to show a substantial likelihood of succeeding on its claim for trademark infringement.

### 2. Trademark Dilution

Corbitt brings two claims for trademark dilution, one federal and one state. The standards for each claim slightly differ and are set forth below. Under either test, Corbitt has not shown a substantial likelihood of success.

### a. Federal Claim

 "The owner of a famous mark shall be entitled … to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark." 15 U.S.C. § 1125(c). The following factors determine the fame and distinction of a mark:

(A) the degree of inherent or acquired distinctiveness of the mark;

(B) the duration and extent of use of the mark in connection with the goods and services with which the mark is used;

(C) the duration and extent of advertising and publicity of the mark;

(D) the geographical extent of the trading area in which the mark is used;

(E) the channels of trade of the goods or services with which the mark is used;

(F) the degree of recognition of the mark in the trading areas and channels of trade used by the mark's owner and the person against whom the injunction is sought;

(G) the nature and extent of use of the same or similar marks by third parties; and

(H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

*Id.*

While some factors favor Corbitt, it has not shown the requisite level of fame. As mentioned above, NO FLOAT is at best a descriptive mark with secondary meaning. In fact, it is entitled to this presumption only because of its incontestable status. Even after assuming this status applies in the dilution context, there is little evidence of the "acquired distinctiveness of the mark." § 1125(c)(A). Similar descriptions are used by competitors. § 1125(c)(G). Aside from quoting the sales figures for NO FLOAT, Corbitt has not provided evidence of the marks's degree of recognition. § 1125(c)(F).

Additionally, the evidence, at this stage, is insufficient to find that GSO's use of "NON–FLOATING" "causes dilution of the distinctive quality of" NO FLOAT.

Corbitt claims GSO's product actually floats away when exposed to enough water and is not pure cypress. GSO, on the other hand, argues the opposite. GSO presented evidence that it authorized a professional analysis of its mulch. According to GSO, the analysis found GSO's mulch to be water resistant and completely composed of cypress. With such a conflict in the evidence, Corbitt has not shown a substantial likelihood of proving trademark dilution.

### b. State Dilution Claim

 Georgia dilution law neither requires a trademark to be famous nor demands the parties be in competition. O.C.G.A. § 10–1–451(b). However, the complaining party must show that "there exists a likelihood . . . of dilution of the distinctive quality of [its] trademark." *Id.* Although fame is not a prerequisite to recovery, the mark must be "distinctive." To be considered distinctive, the mark must be at least descriptive with a secondary meaning. *Dolphin Homes Corp. v. Tocomc Develop. Corp.*, 223 Ga. 455, 458, 156 S.E.2d 45 (1967).

 As discussed above, NO FLOAT is a descriptive mark. The incontestable status under federal law affords NO FLOAT the presumption of secondary meaning. Under Georgia law, however, NO FLOAT'S incontestable status is irrelevant. Secondary meaning is established by evidence that the public associates a trademark with the goods of a particular trader. *Id.* at 456, 156 S.E.2d 45. The trademark holder must present evidence to support the existence of secondary meaning. *Id.* at 457, 156 S.E.2d 45. The evidence provided by Corbitt fails to indicate that NO FLOAT enjoys secondary meaning. More importantly, the evidence is insufficient to support a preliminary injunction.

Aside from lacking distinctiveness, Corbitt has not shown that GSO's use of "NON–FLOATING" will dilute the NO FLOAT mark. The parties have presented conflicting evidence regarding the water-resistant property and composition of GOLDEN TROPHY. As mentioned above, this discrepancy in the evidence undermines Corbitt's claim for a preliminary injunction.

### 3. Remaining Claims

 Corbitt also asserts a variety of federal and state law claims. For reasons discussed above these claims also fail to show a substantial likelihood of success on the merits. With regard to a federal claim for false designation of origin, 15 U.S.C. § 1125(a), courts rely upon the same standard as the likelihood of confusion analysis for alleged trademark infringement. *Ross Bicycles, Inc. v. Cycles USA, Inc.*, 765 F.2d 1502, 1503–04 (11th Cir.1985). As mentioned above, Corbitt has not shown a substantial likelihood of success in proving this claim. The same explanation applies to Corbitt's claim for unfair competition. *See Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1193 n. 4 (11th Cir.2001) ("Courts may use an analysis of federal infringement claims as a 'measuring stick' in evaluating the merits of state law claims of unfair competition." (citations omitted)).

Corbitt's claims for unfair competition and deceptive trade practices do not justify a preliminary injunction. Corbitt has not shown a likelihood of confusion or the requisite intent to support its deceptive trade practices claim. *See* O.C.G.A. § 10–1–372. Similarly, Corbitt has not established a substantial basis for its false advertising claim. O.C.G.A. § 10–1–420.

 Finally, Corbitt's state law claim for use of similar trademarks also fails. O.C.G.A. § 23–2–55. This allegation re-

quires a proof that GSO uses "NON–FLOATING" with the intent to deceive or mislead the public. *Id.* Corbitt has provided no evidence to support this allegation.

### B. A Substantial Threat Corbitt will Suffer Irreparable Harm

■ Corbitt has not shown that it will suffer irreparable harm without a preliminary injunction. "[A] sufficiently strong showing of likelihood of confusion may by itself constitute a showing of ... a substantial threat of irreparable harm." *E. Remy Martin & Co. v. Shaw–Ross Int'l Imports,* 756 F.2d 1525, 1530 (11th Cir. 1985). Because Corbitt has not made a strong showing of likely confusion, it is not entitled to a presumption of irreparable harm. Instead, Corbitt must present evidence supporting this claim.

■ Corbitt argues its goodwill and reputation will suffer without a preliminary injunction. While such harm qualifies as potentially irreparable, Corbitt has not introduced sufficient proof to support these allegations. Corbitt offered instances of alleged consumer complaints regarding confusion. Corbitt also claims people have expressed frustration when they allegedly discovered the mistake. However, this evidence does not establish irreparable harm. The few occasions of frustration do not pose a serious threat to Corbitt's goodwill and reputation. Consequently, a preliminary injunction is unnecessary to protect Corbitt from irreparable harm.

### C. Balance of the Harms

■ The balance of the harms favors GSO. GSO's employees testified that a preliminary injunction could potentially put their company out of business. GSO currently has approximately two million bags of its "NON–FLOATING" mulch in inventory. It estimates that it would cost nearly $2 million to repackage and re-ship this product. Corbitt offered some testimony

to dispute these figures, but it provided no evidence to refute the potential damage to GSO's reputation and goodwill. GSO provided the logical explanation that its customers will lose confidence in GSO if it were to recall its product. Recalling its product will prevent GSO from filling orders. Spring is the crucial period for selling mulch. GSO's employees testified that 80% of GSO's sales occur during this time of year. An inability to supply customers could have devastating effects on GSO's future.

Corbitt, on the other hand, supplied minimal evidence to tip the balance in its favor. Corbitt claims its advertising expenditures will be largely wasted if a preliminary injunction is not issued. In reaching this conclusion, Corbitt largely depends upon the likelihood of confusion between the parties' products. At this time, however, Corbitt has supplied insufficient evidence to support this claim. In addition, Corbitt's evidence regarding the alleged losses due to GSO's redesigned package was inconclusive. GSO plausibly argued that a change in accounting methods could be responsible for this purported loss. Even though Corbitt may suffer some monetary harm and loss of goodwill, GSO would suffer the greater harm.

### D. Effect on the Public

■ Without conclusive evidence of infringement and dilution, entry of a preliminary injunction would be harmful to the public. During the most important season of the year, a strong competitor of NO FLOAT could disappear from the market. A preliminary injunction would not only limit the public's choices, but it could also affect the price they pay for mulch. Accordingly, a preliminary injunction is unwarranted.

### IV. Conclusion

Plaintiff has failed to establish the four elements necessary to enter a preliminary injunction. Plaintiff's Motion for a Preliminary Injunction (Doc. No. 10) is **DENIED.**