**GULFSTREAM AEROSPACE CORPORATION,**
Plaintiff/Counterclaim Defendant,

v.

**CAMP SYSTEMS INTERNATIONAL, INC., Defendant/Counterclaimant.**

No. 405CV018.

United States District Court,
S.D. Georgia,
Savannah Division.

April 18, 2006.

James H. Cox, Carlton Fields, PA, Atlanta, GA, Shawn A. Kachmar, Wade Wilkes Herring, II, Hunter, Maclean, Exley & Dunn, PC, Savannah, GA, for Plaintiff.

Henry Park, Kelsey I. Nix, Willkie, Farr & Gallagher, LLP, New York, NY, Kathleen B. Shields, MARK D. CAHILL, Choate, Hall & Stewart, Boston, MA, Paul W. Painter, Jr., Ellis, Painter, Ratterree & Adams, LLP, Todd Michael Baiad, Williams & Levy, LLP, Savannah, GA, for Defendant.

## ORDER

EDENFIELD, District Judge.

## I. INTRODUCTION

In this copyright infringement case, plaintiff Gulfstream Aerospace Corporation ("Gulfstream") brings an action against defendant Camp Systems International, Inc. ("Camp") related to Camp's use of the maintenance manuals written by Gulfstream for use with Gulfstream aircraft. 405CV039 doc. # 1.[1] In its complaint, Gulfstream brings claims for copyright and trademark infringement, seeking damages and an injunction against Camp's future use of the manuals. *Id.* at 3–4.

Camp answered with two affirmative defenses: first, that Gulfstream's copyrights are invalid; and second, that Camp's use of the maintenance manuals has been a "fair use." 405CV039 doc. # 9 at 5–6. Camp also brings two counterclaims against Gulfstream seeking declaratory judgments on the same grounds. *Id.* at 10–12.[2]

Camp moves for summary judgment as to both of Gulfstream's claims, doc. # 40, and Gulfstream moves for summary judgment as to the copyright claim and Camp's copyright-related counterclaims. Doc. # 43.

## II. BACKGROUND

Gulfstream manufactures and sells corporate jet aircraft. Doc. # 46 at 1. Gulfstream also writes and distributes maintenance manuals for each of its aircraft models. *Id.* at 2. Those manuals are produced in accordance with Federal Aviation Administration ("FAA") regulations requiring aircraft manufacturers to produce and distribute maintenance manuals to (1)

---

1. Gulfstream originally filed two actions stemming from these facts—405CV018 and 405CV039. The two cases were eventually consolidated into 405CV018, and one of the original defendants was dismissed. Thus, though the case against Camp is now numbered 405CV018, some of the pre-consolidation filings in this case remain in 405CV039.

2. In 3 other counterclaims, Camp seeks damages for antitrust violations and tortious interference with business relations. 405CV039 doc. # 9 at 12–16. The Court will not reach those counterclaims in this Order.

aircraft owners and (2) FAA-licensed facilities that provide maintenance services to those aircraft. *Id.* at 2–3 (citing 14 C.F.R. § 21.50). The FAA mandates that maintenance on aircraft be performed as prescribed in those manuals. Doc. # 48 at 5 (citing 14 C.F.R. § 43.13).

Gulfstream maintains a large staff of writers and other professionals to produce the manuals. Doc. # 46 at 3. The manuals are organized in keeping with the industry standard, which is known as ATA 100. Doc. # 59 exh. 1 at 91–93. The costs of researching, writing, and producing the manuals—in both hard copy and CD–ROM form—are significant. *Id.* Thus, Gulfstream licenses the manuals only to owners of its aircraft and charges them about $8,500 per year. It also requires users to acknowledge Gulfstream's proprietary rights in the manuals before they can access them. *Id.* In addition, Gulfstream has registered its copyrights in the manuals. *Id.; see also* doc. # 48 at 5.

Unlike Gulfstream, defendant Camp is primarily engaged in a business known as "maintenance tracking." Doc. # 46 at 4. In accordance with FAA regulations, aircraft owners and operators are required to perform certain scheduled maintenance on an aircraft; the regulations also require them to maintain proof that the maintenance has been performed. *Id.;* doc. # 68 at 56. The process by which such maintenance is scheduled and recorded is known as "maintenance tracking"—a business in which Camp engages for all makes and models of aircraft. However, Gulfstream competes with Camp for the maintenance tracking service of Gulfstream aircraft, as Gulfstream offers computerized maintenance tracking to the owners and operators of its aircraft models. Doc. # 68 at 32–33, 42, 46, 102.

Gulfstream calls its on-line maintenance tracking service "cmp.net," and it provides subscribers with "due lists" identifying deadlines for performance of required maintenance as well as "task cards" describing how to perform the maintenance. Doc. # 68 at 31, 51–53. Those task cards, not surprisingly, come directly from Gulfstream's maintenance manuals. *Id.* at 53–54.

Camp, on the other hand, does not produce its own maintenance manuals for any of the makes or models of aircraft that it tracks. Doc. # 69 at 46–47. Instead, it obtains the manuals from others—usually directly from the manufacturers—and uses them in its maintenance tracking. *Id.; see also* doc. # 73 at 7–11.

Yet Camp had never offered maintenance tracking services on large-cabin Gulfstream aircraft before the fall of 2004. Doc. # 70 at 75–76. Ken Gray, the CEO of Camp, explained that Camp decided to add a Gulfstream tracking service after several of its corporate clients asked it to do so. *Id.* at 77. Thus, in 2004 Camp entered negotiations with Gulfstream to add Gulfstream aircraft to its tracking system. *Id.* at 76, 80.

Gulfstream, however, refused to sell its maintenance manuals to Camp. Doc. # 70 at 84–85; doc. # 122 ¶ 5. Accordingly, Camp could not perform maintenance tracking for its clients' Gulfstreams in the same way that it usually did (*i.e.,* get its own copies of the manuals directly from the manufacturers). Doc. # 70 at 84. For Gulfstream planes, on the other hand, Camp resorted to borrowing the manuals from the aircraft owners and loading parts of them onto Camp's systems. *Id.* at 86.

Camp considered this a legitimate transfer of the manuals, because Gulfstream

expressly allows the owner of a Gulfstream aircraft to disclose or transmit the contents of his manual to others "to maintain, operate or repair the Aircraft...." Doc. # 107 exh. 15 § 4.3. Nonetheless, Camp preferred to have working relationships with manufacturers so that it could receive immediate news of updates to the manuals. *Id.* at 85–86; doc. # 107 exh. 35 at 37–38. Gulfstream is the only aircraft manufacturer that has refused to sell or provide its manuals to Camp. Doc. # 70 at 84.

Under Camp's subscription agreement, Gulfstream-owning clients must provide Camp with a copy of the Gulfstream manual. Doc. # 69 at 35–37. Camp then copies parts of the Gulfstream manual into its computer system. *Id.* at 36–38. Thus, when Camp issues due lists and task cards to its customers to notify them of the need for maintenance, it sends them copies of the relevant pages from the Gulfstream manual. *Id.* at 43–44.

Because of federal regulations, Camp cannot produce its own version of the Gulfstream manuals. Doc. # 107 exh. 35 at 22–24. Therefore, if Camp does not have access to Gulfstream's manuals, it cannot provide maintenance tracking for its customers' Gulfstream aircraft. Doc. # 122 ¶ 5.

At the same time, Gulfstream does not lose any sales of its manuals on account of Camp's use of them. Doc. # 123 exh. 6 at 140; doc. # 111 ¶ 11. This makes sense, for Camp sends task cards only to its Gulfstream-owning clients (who have their own copies) and repair stations-and those repair stations, per FAA regulations, must *also* have their own copies of the Gulfstream manuals. Doc. # 48 at 5 (citing 14 C.F.R. § 145.109).

Despite this, Gulfstream continued to refuse to provide Camp with manuals for Gulfstream aircraft. Camp, therefore, wrote a letter to the FAA seeking a ruling on the issue. In response, the FAA stated that although Gulfstream is not obligated to furnish manuals directly to Camp, it must furnish them to Gulfstream owners, who may then choose to utilize Camp's tracking services. Doc. # 59 exh. 12 at 2. Nevertheless, Gulfstream continued to object to Camp's use of Gulfstream's manuals in this manner. *Id.;* doc. # 122 ¶ 5.

Gulfstream has now sued Camp over Camp's use of its manuals. 405CV039 doc. # 1. As explained *supra,* Gulfstream seeks damages and an injunction against Camp's continued use of the manuals. *Id.* at 3–4. Gulfstream also brings a false designation of origin (trademark infringement) claim against Camp. *Id.* at 3.

In response, Camp moves for summary judgment on Gulfstream's copyright and trademark claims. Doc. # 40. Gulfstream also moves for summary judgment on its copyright claim, as well as for summary judgment on Camp's first two copyright counterclaims. Doc. # 43; *see also supra* note 2.

## III. *ANALYSIS*

### A. Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine factual dispute exists if the jury could return a verdict for the non-moving party. *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1085 (11th Cir.2004). In examining the record, the Court views the evidence in the light most favorable to the non-moving party. *Id.*

Normally, then, to prevail on summary judgment a defendant need only negate one element of the plaintiff's case. However, where the moving party bears the burden of proof at trial—as here on Camp's affirmative defense of fair use— that party must demonstrate that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party." *Irby v. Bittick*, 44 F.3d 949, 953 (11th Cir.1995) (cite omitted); *see also In re Stone*, 199 B.R. 753, 763 n. 9 (N.D.Ala.1996) (burden shifting for affirmative defense).

Fair use, though, is a mixed question of fact and law. *Newport–Mesa Unified Sch. Dist. v. State of Cal. Dep't of Educ.*, 371 F.Supp.2d 1170, 1176 (C.D.Cal.2005); *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 560, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). Thus,

> [i]f there are no genuine issues of material fact, or if, even after resolving all issues in favor of the opposing party, a reasonable trier of fact can reach only one conclusion, a court may conclude as a matter of law whether the challenged use qualifies as a fair use of the copyrighted work. *Id.*

### B. Copyright Principles

The purpose of copyright law is "[t]o promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries." U.S. Const., Art. I, § 8, cl. 8; *see also Eldred v. Ashcroft*, 537 U.S. 186, 223, 123 S.Ct. 769, 154 L.Ed.2d 683 (2003) (Stevens, J., dissenting). The touchstone of copyright law is that copyright protection is afforded only to "original works of authorship." 17 U.S.C. § 102(a).

 However, copyright law does not protect *ideas;* rather, it protects only original expression. *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 349–350, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). "To this end, copyright assures authors the right to their original expression, but encourages others to build freely upon the ideas and information conveyed by a work." *Id.*

The law allows an author to apply for registration when he believes he has a copyright in a work. 17 U.S.C. § 410(a). If the Register of Copyrights determines that the work contains "copyrightable subject matter," the Register issues a certificate of registration to the author. *Id.* In any subsequent judicial proceedings, such a registered copyright has a rebuttable presumption of validity. 17 U.S.C. § 410(c); *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1541 (11th Cir.1996).

 If the holder of the registration subsequently believes that another party is improperly using his registered work, he may bring a suit for infringement. To establish copyright infringement, a party must show (1) that he holds a valid copyright and (2) that the other party has engaged in unauthorized copying. *See, e.g., NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 476 (2d Cir.2005).

### C. Camp's Alleged Infringement

In this case, Gulfstream has registered copyrights in its manuals and numerous revisions of those manuals. *See* doc. # 98 exh. 1 subexhs. 1–75. However, a certificate of registration in a work does not mean that the *entire* work is copyrightable, nor does it purport to identify which aspects of a work are copyrightable; instead, the certificate merely acknowledges

that the work contains "copyrightable subject matter." 17 U.S.C. § 410(a); *see also Feist*, 499 U.S. at 348, 111 S.Ct. 1282 ("[T]he mere fact that a work is copyrighted does not mean that every element of the work may be protected").

In accordance with 17 U.S.C. § 410(c), the copyrights in Gulfstream's manuals are presumed to be valid. To rebut that presumption, Camp has presented an expert affidavit from David Shipley, a copyright professor at the University of Georgia School of Law, who opines that "Gulfstream's copyrights on its FAA-required aircraft maintenance manuals are so thin as to be almost nonexistent." Doc. # 125 exh. 2 at 1.[3]

Shipley's opinion is premised largely on 17 U.S.C. § 102(b). That statute provides that

> [i]n no case does copyright protection for an original work of authorship extend to any idea, procedure, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described.

*Id.* This statute, Shipley states, means that "copyright protection does not extend to a form of expression necessarily dictated by the underlying subject matter." Doc. # 125 exh. 2 at 15.

The manuals in this case are written pursuant to federal regulations requiring the manufacturer to distribute a manual to all purchasers of its aircraft. 14 C.F.R. § 21.50. Those regulations require that the manuals include details on "the airplane and its systems, basic control and operation information, servicing information, maintenance instructions, troubleshooting information, information regarding the order and method of removing parts, . . . and so on." Shipley report, doc. # 125 exh. 2 at 12 (describing requirements of 14 C.F.R. Part 23 Appendix G).

Shipley's description is accurate. Upon independent examination of the regulations and the facts here, the Court concludes that Gulfstream's manuals are mandated to contain procedures ("maintenance information" and "troubleshooting information"), systems (details on "the airplane and its systems"), and methods of operation ("basic control and operation information," "servicing information," and "information regarding the order and method of removing parts"). *See* 14 C.F.R. Part 23 Appendix G. As mentioned above, "procedures," "systems," and "methods of operations" are all specifically *not* copyrightable under 17 U.S.C. § 102(b)—regardless of how they are expressed.

Moreover, federal regulations mandate that "[t]he Instructions for Continued Airworthiness must be in the form of a manual or manuals as appropriate for the quan-

---

3. Gulfstream argues that Shipley's opinion is inadmissible because: (1) his affidavit was not accompanied by a sworn statement; (2) he is not qualified to testify as an expert witness under F.R.Evid. 702; and (3) he offers improper opinions on legal conclusions. Doc. # 112.

Subsequent to Gulfstream's brief, Shipley submitted a sworn supplemental report. *See* doc. # 125 exh. 3 (supplemental expert report with signature); *id.* exh. 4 (sworn deposition by Gulfstream's counsel). Furthermore, Shipley's opinion easily meets the standard of admissibility under F.R.Evid. 702. The Court thus finds no merit in Gulfstream's first two objections. Finally, whether Shipley may opine as to mixed questions of fact and law is a gray area. *See, e.g., U.S. v. Bradley*, 405CR059 doc. # 434 (S.D.Ga. Order entered 2/20/06) (Unpublished). The law generally disfavors such expert opinions. *Id.*

The Court need not resolve the issue, however, for it does not rely on Shipley's opinion in reaching its result here, though the Court will cite to it to pinpoint the issues.

tity of data to be provided," and that "[t]he format of the manual or manuals must provide for a practical arrangement." 14 C.F.R. Part 23 App. G § G23.2(a), (b). Thus, not only is the *content* of the manuals specified by regulation, but also the *format* of the manuals is specified so that an aircraft manufacturer may not add unnecessary sections to give the manuals a "creative" or "original" touch.

From the facts presented by Camp, then, and from the facts judicially noticed by the Court—that is, that Gulfstream seeks to copyright here maintenance manuals written in accordance with federal guidelines that significantly prescribe the content and format of those manuals—it is clear that much, if not all, of Gulfstream's manuals are *not* copyrightable in light of 17 U.S.C. § 102(b).

Nevertheless, Shipley (and thus Camp) has conceded that he believes there is a "thin copyright" in Gulfstream's manuals. Doc. # 125 exh. 4 at 98 (expert deposition). Shipley also concedes that Camp has copied pages from the manuals that he believes have "some copyrightable expression." As an example, he cites Gulfstream's detailed description of its landing gear system, which could have been expressed in more than one way and thereby avoids the application of 17 U.S.C. § 102(b). Doc. # 125 exh. 3 at 2 (supplemental report).

However, because the Court does not have a complete copy of the manual before it, it is difficult to determine which portions of the manuals, if any, should receive copyright protection. By the same token, the Court cannot adequately determine whether Camp has infringed on any copyrighted material by using certain portions of the manual.

Nevertheless, the Court need not reach those questions at this point, because if the Court determines that Camp's use of the manuals is a "fair use," there is no infringement. 17 U.S.C. § 107; *see also, e.g., Newport–Mesa Unified Sch. Dist. v. State of Cal. Dep't of Educ.,* 371 F.Supp.2d 1170, 1176 (C.D.Cal.2005); *NXIVM Corp. v. Ross Inst.,* 364 F.3d 471, 476 (2d Cir. 2004).

### D. Fair Use

17 U.S.C. § 107 provides that

the fair use of a copyrighted work, ... for purposes such as criticism, comment, news reporting, teaching (including multiple copies in classroom use), scholarship, or research,[4] is *not an infringement of copyright.* In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107 (emphasis added).

 The burden is on the defendant to prove the defense of fair use; however, a

---

4. This list of potential "fair uses" is not meant to be exhaustive. The Supreme Court has noted only that the fair use inquiry "may be guided" may by these examples. *Campbell v. Acuff–Rose Music, Inc.,* 510 U.S. 569, 578, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994).

defendant "need not prove that each of the factors set forth in § 107 weighs in [its] favor." *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 477 (2d Cir.2004). "Instead, all factors must be explored and the results weighed together in light of the purposes of copyright and the fair use defense." *Id.* (citing *Campbell*, 510 U.S. at 578, 114 S.Ct. 1164).

■ Moreover, the fair use doctrine "permits and requires courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *Campbell*, 510 U.S. at 578, 114 S.Ct. 1164 (citation and internal punctuation omitted); *see also Newport–Mesa Unified Sch. Dist. v. State of Cal. Dep't of Educ.*, 371 F.Supp.2d 1170, 1176 (C.D.Cal.2005).

### 1. Purpose and Character of Use

■ There is no dispute in this case that Camp's use of the Gulfstream manuals is a commercial use. Doc. # 106 ¶¶ 31–32. Camp uses the manuals in conjunction with its core business—a maintenance tracking service for aircraft—and charges its customers a subscription fee. *Id.*

■ However, commercial use is not the only consideration under this prong of the fair use inquiry, as "the court also considers whether the use is transformative." *Newport–Mesa*, 371 F.Supp.2d at 1177. A work is transformative "if it adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Id.* Yet Camp's use in this case cannot be considered "transformative," for it uses the manuals in the very way they were intended to be used.

There is one additional consideration under this first prong, which asks the Court to weigh both the purpose and "character" of Camp's use of Gulfstream's manuals. In *NXIVM Corp. v. Ross Institute*, 364 F.3d 471 (2d Cir.2004), that Court considered whether the defendant's "unauthorized" use of the plaintiff's work should count against the defendant in a fair use inquiry. *See also Harper & Row*, 471 U.S. at 562–63, 105 S.Ct. 2218 ("Also relevant to the character of the use is the propriety of the defendant's conduct") (citation and internal punctuation omitted).

In this case, Camp attempted to negotiate with Gulfstream for the use of Gulfstream's manuals. Doc. # 70 at 76, 80; doc. # 106 ¶¶ 39–45. Gulfstream, however, refused to sell its manuals to Camp. *Id.;* doc. # 106 ¶¶ 36, 43–44. Camp then began maintenance tracking services for Gulfstream aircraft anyway. Doc. # 106 ¶¶ 35–37. Camp therefore admits that it began using its customers' Gulfstream manuals after being denied Gulfstream's permission.

Nevertheless, several facts mitigate against a finding of bad faith on Camp's part. First, as to each manual Camp obtained from a customer, it used that manual "exclusively for that same customer's benefit, and for the exclusive purpose for which the customer obtained the manual from Gulfstream [that is, aircraft maintenance]." Doc. # 106 ¶ 36; doc. # 107 exh. 35 at 37 ("My view of it was that we were not violating copyright because we were planning to use the operator's own manuals for that operator"). Second, the sales contract for a Gulfstream aircraft specifically licenses the purchaser to use the manual to support maintenance. Doc. # 107 exh. 15 § 4.3.

Finally, in a letter by the FAA in response to inquiries from Camp and Gulfstream, the FAA blessed Camp's use of

the Gulfstream owners' own manuals: "The FAA considers it contrary to the intent of the regulation for a design approval holder [such as Gulfstream] to restrict the ability of an owner to use those [manuals] to either perform, or facilitate the performance of, required maintenance on a product." Doc. # 59 exh. 12.

The commercial nature of Camp's use, along with the fact that Camp's use was not transformative, leads the Court to find that the first factor in this fair use inquiry weighs against Camp. Since the Court finds no evidence of bad faith, Camp's "conduct" will not weigh against it on this first factor.[5]

### 2. Nature of Copyrighted Work

■ The second fair use factor "calls for recognition that some works are closer to the core of intended copyright protection than others . . . ." *Campbell*, 510 U.S. at 586, 114 S.Ct. 1164. Thus, a pure work of fiction is closer to the "core" of copyright protection than a factual compilation, just as a motion picture is closer to that core than stock news footage. *Id.* (quotes and citations omitted).

Under the second fair use factor, the nature of Gulfstream's work is predominantly factual rather than creative. As the Court has already noted, the manuals contain mostly procedures, lists of systems, and detailed methods of operations. This factor points in favor of finding that Camp has made a fair use of the manuals.[6] *See Sinai v. Bureau of Auto. Repair*, 1992 WL 470699 at * 3 (N.D.Cal.1992) (unpublished) ("[T]he factual nature of the copyrighted work [an emissions manual] weighs in [the defendant's] favor"); *Harper & Row*, 471 U.S. at 563, 105 S.Ct. 2218 ("The law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy").

### 3. Amount and Substantiality of Use

Camp does not copy or use all of Gulfstream's manuals. *See, e.g.,* doc. # 69 at 90–91. Camp's customers give Camp their CD version of the manual, and Camp makes a copy. *Id.* However, Camp does not load the entire soft copy of the manual onto its own system; it merely "extracts" the specific pages that describe the maintenance tasks due to be performed. *Id.;* *see also* doc. # 70 at 20–22.

Thus, while Camp does not use the entire manuals—and, for that matter, might not use any copyrighted portions of the manuals—it still admittedly uses a significant amount of Gulfstream's work, from both a quantitative and a qualitative standpoint. *See* doc. # 48 at 12; doc. # 112 at 7

---

5. Arguably, the Court could infer bad faith from Camp's use of the manuals after being denied Gulfstream's permission. However, in *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994), the Supreme Court closed that door when it wrote that "being denied permission to use a work does not weigh against a finding of fair use." *Id.* at 585 n. 18, 114 S.Ct. 1164; *see also NXIVM*, 364 F.3d at 479 n. 2 (noting general view that bad faith analysis is not to be given much weight in fair use inquiry).

Regardless, any bad faith inference that might be drawn is negated by other evidence demonstrating Camp's good faith belief that it was using the manuals appropriately.

6. The Court does not doubt that Gulfstream has spent significant amounts of time and money in writing and physically producing these manuals. Doc. # 106 ¶ 34. However, Gulfstream's effort is irrelevant, for the Supreme Court has unequivocally rejected the notion that effort gives rise to a claim for copyright. *Feist*, 499 U.S. at 352–58, 111 S.Ct. 1282 (rejecting "sweat of the brow" basis for copyright).

n. 4; doc. # 125 exh. 3 at 1 (Camp uses 2,200 out of the more than 12,000 total pages in the Gulfstream manuals).

This factor therefore counts against a finding of fair use. However, it does not count against Camp as strongly as it would if Camp were simply copying Gulfstream's entire manuals onto its system. And even if Camp did load the entire manuals onto its system, that would still not preclude a finding of fair use. *See, e.g., Newport–Mesa,* 371 F.Supp.2d at 1178 (citations omitted).

### 4. Effect of Use On Market for Work

The fourth factor in a fair use inquiry—the effect of the alleged infringer's use upon the potential market for or value of the copyrighted work—is "undoubtedly the single most important element of fair use." *Mulcahy v. Cheetah Learning LLC,* 386 F.3d 849, 854 (8th Cir.2004) (citing *Harper & Row Publishers, Inc. v. Nation Enters.,* 471 U.S. 539, 566, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985)).

Here, Gulfstream has conceded that Camp's use of the manuals does not adversely affect the market for the manuals. *Compare* doc. # 47 ¶ 11 ("Gulfstream's damages expert testified that Gulfstream would not have sold any more manuals if Camp did not provide maintenance tracking services") (internal punctuation omitted) *with* doc. # 111 ¶ 11 ("[Gulfstream] admits this fact ..."). Thus, there is no evidence that Camp's use has affected the market for the *original* copyrighted work.

Indeed, the lack of evidence of an effect on the sale of *manuals themselves* is not

surprising, given that all of Camp's subscribers must purchase manuals directly from Gulfstream before Camp will perform maintenance tracking for them. Nor is there any evidence that Camp distributes copies of the manuals to other manual purchasers, such as aircraft repair shops, or does anything else to affect the sale of Gulfstream manuals.

However, Gulfstream argues that Camp's use of the manuals in its maintenance tracking service adversely affects Gulfstream's *own* maintenance tracking service—and that this effect is relevant to the fair use inquiry because that use is also a part of the manuals' value. Doc. # 46 at 23. On this point, Gulfstream contends that the cmp.net service constitutes a "derivative" work or market for the manuals.[7] *See* doc. # 46 at 23. And it is true that this fair use inquiry "must take account not only of harm to the original but also of harm to the market for derivative works." *Campbell,* 510 U.S. at 590, 114 S.Ct. 1164.

However, this Gulfstream argument is misguided, for a "derivative work" is "a work based upon one or more preexisting works, such as a translation ..., dramatization, fictionalization ..., condensation, or any form in which a work may be recast, transformed, or adapted." 17 U.S.C. § 101. Gulfstream's use of its manuals in conjunction with its cmp.net tracking service, however, in no way "transforms" the manuals, as the manuals are used as-is in precisely the manner for which they were intended. Hence, any argument that Gulfstream's cmp.net service is a "derivative work" based on the Gulfstream manuals cannot stand.[8]

**7.** The statutory rights of a copyright owner include the exclusive right "to prepare deriva-

tive works based upon the copyrighted work." 17 U.S.C. § 106(2).

**8.** In its complaint, 405CV039 doc. # 1 at 4–5,

A better approach for Gulfstream would be to characterize its use of the manuals in conjunction with its cmp.net service as a part of the "bundle" of property rights attached to the copyright in the manuals. *Harper & Row*, 471 U.S. at 568, 105 S.Ct. 2218 ("If the defendant's work adversely affects the value of any of the rights in the copyrighted work ... the use is not fair"). Yet this approach, too, suffers from a significant pitfall, this time based on the purposes of copyright law.

As the Court highlighted earlier, the purpose of copyright law is "[t]o promote the progress of science and useful arts...." U.S. CONST., Art. I, § 8, cl. 8; *see also Newport–Mesa*, 371 F.Supp.2d at 1176. However, the Court has already noted that giving copyright protection to these federally-mandated manuals serves neither of these aims. *See supra* at 5; *see also* doc. # 59 exh. 14 at 40 (Gulfstream executive Larry Flynn admitting that "the value of the publications business [manuals] is you got to have them to be in business"). Of course, if the goals of copyright are not served by protecting the manuals in their primary use, then they are surely not served by protecting the manuals on account of their *secondary* use in conjunction with Gulfstream's cmp.net service.

Therefore, this fourth fair use factor weighs heavily in favor of Camp, for copyright law does not mean to protect an "author" such as Gulfstream on these facts, where Gulfstream's desire for copyright protection has nothing to do with needing an incentive to create its manuals.

Rather, what Gulfstream seeks here is to use its claimed copyright in its manuals to gain a judicially-enforced monopoly in maintenance-tracking services for Gulfstream aircraft. That outcome would be injurious to the free-market public policy advanced through antitrust and restraint-of-trade laws. It would be especially egregious since Gulfstream is required by federal regulations to produce the manuals anyway. Again, those federal regulations leave Gulfstream little room to make decisions regarding either the format or the content of those manuals.

Gulfstream's monopolization efforts should not get an assist from the Court through an expansive reading of copyright law. *See Campbell*, 510 U.S. at 578, 114 S.Ct. 1164 ("The fair use doctrine ... permits and requires courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster") (internal punctuation and citation omitted). It does not take an economic visionary to see that granting manufacturers copyrights in their federally-mandated maintenance manuals would create service monopolies for those manufacturers, thus decreasing service-center choices (and potentially safety) for consumers in the aircraft industry and other industries.

### 5. Fair Use Conclusion

Two of the fair use factors point against fair use, while two of the factors point toward it. Nevertheless, given the import of the fourth factor, and the

---

Gulfstream stated that Camp had made unlawful derivative works based on Gulfstream's manuals. However, Gulfstream did not make that argument in its briefs, doc. ##46, 112, so the argument is deemed waived. *U.S. v. Britt*, 437 F.3d 1103, 1104 (11th Cir.2006).

In any event, if the Court finds fair use based on Camp's use of portions of the *original* Gulfstream manuals, then *a fortiori* it would find fair use of any derivative works based on those manuals.

Court's finding that granting copyright protection under these facts would not serve the purposes of copyright law, the Court concludes as a matter of law that Camp has made a fair use of Gulfstream's manuals. *See Campbell,* 510 U.S. at 578, 114 S.Ct. 1164 ("All [of the fair use factors] are to be explored, and the results weighed together, in light of the purposes of copyright").

## E. Trademark Claim

Gulfstream has also brought a claim against Camp for "false designation of origin"—that is, trademark infringement. 405CV039 doc. # 1 at 4. Gulfstream argues that Camp's use of Gulfstream manuals, and its promotion of its ability to service Gulfstream aircraft, "clearly implies ... that defendant is distributing such ... works with the sponsorship or approval of Gulfstream." *Id.* at 4–5.

Trademark law, just like copyright law, recognizes a statutory fair use defense "where the mark is used only to describe the goods or services of a party, or their geographic origin." 15 U.S.C. § 1115(b)(4); *see also, e.g., New Kids on the Block v. News America Publ'g, Inc.,* 971 F.2d 302, 308 (9th Cir.1992). The purpose, of course, is to prevent parties from appropriating certain words and thereby restricting the language. *New Kids,* 971 F.2d at 306; *see also Corbitt Mfg. Co. v. GSO America, Inc.,* 197 F.Supp.2d 1368, 1377 (S.D.Ga.2002). "Indeed, it is often virtually impossible to refer to a particular product for purposes of comparison, criticism, point of reference, or any other purpose without using the mark." *Id.*

The trademark fair use doctrine has three requirements:

First, the product or service in question must be one not readily identifiable without use of the trademark; second, only so much of the trademark may be used as is reasonably necessary to identify the product or service; and third, the user must do nothing that would, in conjunction with the trademark, suggest sponsorship or endorsement by the trademark holder.

*New Kids,* 971 F.2d at 308; *see also Century 21 Real Estate Corp. v. Lendingtree, Inc.,* 425 F.3d 211, 220 (3rd Cir.2005); *PACCAR Inc. v. TeleScan Tech., LLC,* 319 F.3d 243, 256 (6th Cir.2003).

■■■ Camp's use of the Gulfstream trademark in this case easily meets these three requirements. First, Camp services many makes and models of aircraft; it must use the trademarked "Gulfstream" name and identify each of the Gulfstream models it services to offer a meaningful description to its customers. *See, e.g., Volkswagenwerk Aktiengesellschaft v. Church,* 411 F.2d 350, 352 (9th Cir.1969) (finding fair use of trademark where auto repair shop used trademarked term "Volkswagen" to identify that it worked on Volkswagen models).

Second, there is no evidence in the record from which a jury could decide that Camp uses the Gulfstream trademark any more than necessary. It is true that Camp leaves the GULFSTREAM logo at the top of the pages it copies from the manuals. *See* doc. # 59 exh. 25. However, given that these pages are sent to repair shops, it is surely more important to preserve safety (by leaving the information on the page to avoid confusion) than to preserve Gulfstream's trademark (by removing the make and model designation from the pages).

Finally, there is no evidence that Camp suggests sponsorship by Gulfstream in us-

ing Gulfstream's trademark. In fact, Camp includes an express disclaimer of sponsorship in the documents sent to customers. Doc. # 59 exhs. 9, 10.

The Court thus concludes as a matter of law that Camp is making a fair use of Gulfstream's trademarks. Accordingly, Camp cannot be liable for trademark infringement.

## IV. *CONCLUSION*

Accordingly, the Court **GRANTS** the motion for summary judgment by defendant Camp Systems International, Inc., as to both the copyright and false designation of origin (trademark) claims by plaintiff Gulfstream Aerospace Corporation. Doc. # 40. It follows that Gulfstream's motion for summary judgment on the copyright claims is **DENIED.** Doc. # 43.

Finally, for docket-clearing purposes only the Court **DENIES WITHOUT** **PREJUDICE** Gulfstream's other motion for summary judgment, doc. # 44, and Gulfstream's motion to bifurcate, doc. # 25, as well as each party's motion to compel. Doc. ##38, 60. Within 15 days of the date this Order is served, the parties shall confer and discuss a settlement. If no settlement is reached, the parties may renew doc. ##25,38, 44, and 60, and this case will proceed as to Camp's counterclaims.